T.C. Memo. 1998-151


UNITED STATES TAX COURT


MANAHARLAL C. PAREKH AND ELIZABETH PAREKH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21418-95.                    Filed April 27, 1998.


<u>Michael D. Cropper</u>, for petitioners.

<u>Michael C. Prindible</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in petitioners' 1990 and 1991 Federal income taxes in the amounts of $117,021.24 and $12,343.39, respectively.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioners are entitled to a deduction under section 162 or under section 165(e)[1] for a $450,000 payment in connection with a guarantor agreement; and (2) whether petitioners may include the $450,000 payment in computing net operating losses (NOL's) from the bankruptcy estate of petitioner Manaharlal C. Parekh.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Odessa, Texas, at the time they filed the petition in this case. Petitioners filed joint Federal income tax returns for the 1990 and 1991 taxable years.

Manaharlal C. Parekh (petitioner) is a thoracic and peripheral vascular surgeon who practices in the Midland/Odessa area of Texas.

---

[1] At trial, petitioners raised for the first time the deductibility of the $450,000 payment under sec. 165(e) as a theft loss. We will not, as a general rule, consider an issue raised for the first time at trial since it has not been properly pleaded. See Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975). When issues not raised by the pleadings are tried by implied consent of the parties, however, the issues shall be treated as if they had been raised in the pleadings. Rule 41(b). The parties satisfied Rule 41(b) when they introduced the issue at trial and acquiesced in the introduction of evidence on that issue without objection. LeFever v. Commissioner, 103 T.C. 525, 538-539 (1994), affd. 100 F.3d 778 (10th Cir. 1996); see also Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir. 1982).

During the years in issue, petitioner's close friend Ignacio Cisneros (Cisneros) was involved in insulation manufacturing. In November 1984, Cisneros introduced petitioner to Dwight Chester Wheeler (Wheeler). Cisneros, Wheeler, and petitioner were interested in constructing an insulation manufacturing plant (the plant). Hoping to generate revenue for the construction of the plant, petitioner, Cisneros, and Wheeler met on several occasions to discuss investment opportunities. On April 1, 1985, the three formed a partnership called Permian Energy Co. (the partnership) to invest in producing oil and gas properties.

Over a period of several months, Wheeler showed petitioner various oil wells[2] (the wells) which were producing very little oil and encouraged petitioner to put money into the partnership so that the wells could be "worked over". Wheeler advised petitioner that oil and gas production would increase if the wells were "worked over" by perforating different zones in the geological formation. In order for the partnership to work over the wells, petitioner contributed additional funds to the company.

The partnership's checks required at least two signatures to draw on its account. Petitioner, Cisneros, and Wheeler had the authority to sign the checks. During initial operations of the

---

[2] It is not clear from the record, but it appears that Wheeler initially owned the oil leases and he contributed them to the partnership.

partnership, Wheeler advised petitioner that he needed blank checks drawn on the partnership account to pay for oil field services. Petitioner allowed Wheeler access to the requested checks.

From April 1 to about May 1985, the partnership had spent $250,000 to $300,000 in working over four or five oil wells, and production had not increased. Wheeler approached petitioner several times about acquiring a package of leases on "good-producing wells" from Amoco Oil Co. (Amoco).

On July 31, 1985, the partnership was incorporated and became Permian Energy Co. (PEC). Petitioner was the sole shareholder of PEC. The members of PEC's board of directors were petitioners and Cisneros.

On September 27, 1985, the board of directors of PEC authorized and directed petitioner and Cisneros to borrow up to $1,900,000 on behalf of PEC for the purpose of purchasing certain oil and gas properties from Amoco. On October 1, 1985, PEC borrowed $1,700,000 from InterFirst Bank Odessa, N.A.,[3] (the bank) to purchase those oil and gas properties from Amoco. PEC and the bank executed a promissory note (the note) with an original maturity date of October 24, 1986. Petitioner guaranteed the note. After several extensions of the maturity

---

[3]  InterFirst Bank Odessa, N.A., subsequently became First Republic Bank Odessa, N.A., then became NCNB Texas National Bank of Odessa, Texas, and now is known as NationsBank.

date, the bank and PEC agreed to a final maturity date sometime in 1988.

From 1986 to 1989, there was a substantial decrease in oil production from the wells that PEC had purchased. Additionally, the posted crude oil prices dropped from $28 per barrel in July 1985 to $14.85 per barrel in July 1988. PEC reported gross sales and net losses for tax purposes as follows:

| Year Ending June 30 | Gross Oil & Gas Income | Net Loss |
|---|---|---|
| 1986 | $1,649,035 | $36,219 |
| 1987 | 557,892 | 653,955 |
| 1988 | 642,479 | 305,313 |
| 1989 | 177,763 | 85,719 |

Theft Loss

On November 11, 1985, petitioner and Cisneros suspected that Wheeler had misappropriated about $100,000 of PEC's funds which was supposed to be used to pay a commission. In addition, petitioner believed that Wheeler cashed the blank checks petitioner gave him, and he misappropriated these funds for his personal use. Consequently, on November 12, 1985, petitioner changed the locks to PEC's office and informed Wheeler that he was not to enter the office.

In April 1986, petitioner and Cisneros met with representatives from the Texas Rangers--the law enforcement division for the State of Texas. Petitioner and Cisneros

informed the Texas Rangers of their suspicion that Wheeler had stolen money from PEC. By the end of 1987, petitioner believed he knew how much Wheeler had stolen from either him or PEC. Wheeler died in 1989.

Petitioners did not claim a theft loss deduction on their 1985, 1986, 1987, or 1989 income tax return. On or about October 15, 1992, petitioners timely filed an amended tax return and a claim for refund for the 1988 taxable year. Petitioners based their claim for refund upon a theft loss deduction in the amount of $374,922.45 which they allege Wheeler stole from petitioner. On July 21, 1995, the Internal Revenue Service denied petitioners' claim for refund for the 1988 taxable year.

Default on Bank Loan by PEC

In 1988, PEC was unable to make payments due under the note. In August 1988, the bank turned to petitioner to perform on his guarantor agreement. On January 11, 1989, the bank obtained a default judgment against petitioner (the default judgment) in the amount of $1,105,552.75 with respect to petitioner's guaranty on the note. On April 13, 1989, the bank obtained from the Texas State District Court a temporary restraining order to enjoin petitioner from conveying, encumbering, or disposing of any of his assets.

On April 21, 1989, petitioner filed for protection under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court

for the Western District of Texas, El Paso Division (the bankruptcy court). On April 27, 1989, the bank filed an Original Verified Complaint and Application for Temporary Restraining Order and Preliminary Injunction combined with Complaint for Declaratory Judgment (the complaint) in petitioner's bankruptcy case. The complaint sought to offset a pension fund deposit account and two commercial checking accounts maintained by petitioner at the bank against the amount owed by PEC to the bank. On or about August 7, 1989, the bank filed an Amended Proof of Claim in petitioner's bankruptcy case in the amount of $1,108,472.60. In response to the complaint, the bankruptcy court entered an order (the order) in January 1990 which permitted the bank to exercise setoff rights on $260,000 of funds from petitioner's bank accounts and required petitioner to pay approximately $190,000 to the bank from petitioner's property acquired after filing the bankruptcy petition, for a total of $450,000.

On February 7, 1990, petitioner and his bankruptcy estate, through bank offsets and direct payments, paid a total of $450,000 to the bank in satisfaction of the bank's Amended Proof of Claim. On petitioners' 1990 joint income tax return, petitioners claimed deductions for NOL's from the bankruptcy estate and for expenses to protect petitioner's business reputation in the amounts of $299,920 and $143,070, respectively.

For the 1991 taxable year, petitioners claimed an NOL carryover from 1990 in the amount of $22,056.  Although petitioners prepared tax returns for the bankruptcy estate for the 1989 and 1990 taxable years, they were not filed as of the time petitioners filed the petition in this case.

OPINION

The first issue is whether petitioner's $450,000 payment as a guarantor of the note is deductible as an ordinary loss under section 162 or under section 165(e).

Petitioner contends that the amount in question is deductible under section 162 or, alternatively, under section 165(e).  Petitioner alleges that Wheeler stole from PEC by misappropriating funds from PEC.  Petitioner argues that those losses resulted in PEC's inability to make payments due under the note, and, consequently, the bank turned to petitioner to perform on the note.  Petitioner also argues that, because PEC did not financially exist separately from petitioner, he is entitled to a theft loss deduction under section 165(e) of the amount paid to the bank in 1990.  Alternatively, petitioner contends that the payments were made to the bank to protect his business reputation and therefore are deductible under section 162.

Respondent contends that the amount paid on the guaranty is a nonbusiness bad debt, which is deductible only as a short-term

capital loss under section 166(d) and section 1.166-9(b), Income Tax Regs. We agree with respondent.

Guarantor Payments

Section 166 allows a deduction for the loss sustained on account of a bad debt. A deduction is allowed to the extent that the debt becomes worthless during the year. Sec. 166(a). Section 1.166-9(b), Income Tax Regs., applies to a taxpayer who enters into a transaction for profit, but not in the course of his trade or business, to act as a guarantor, endorser, or indemnitor. This section of the regulations provides that "a payment of principal or interest made * * * by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor, endorser, or indemnitor is treated as a worthless nonbusiness debt". Section 1.166-9(b), Income Tax Regs., further provides that neither section 163 nor section 165 will apply with respect to such a payment. Therefore, if the payment falls under both sections 165 and 166, then it can be deducted only as a bad debt under section 166. Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312, 322-325 (1996), affd. without published opinion 121 F.3d 723 (11th Cir. 1997); see Putnam v. Commissioner, 352 U.S. 82, 85-93 (1956); Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 189 (1934); Horne v. Commissioner, 59 T.C. 319, 336 (1972), affd. 523 F.2d 1363 (9th Cir. 1975).

Petitioner guaranteed the promissory note.  Upon PEC's
failure to perform on the note, petitioner was obligated to make
payments to the bank under the guarantor agreement.  With or
without a right of subrogation, a guarantor's loss generally will
be in the nature of a bad debt loss and will fall under section
166.  Black Gold Energy Corp. v. Commissioner, 99 T.C. 482, 487
(1992), affd. without published opinion 33 F.3d 62 (10th Cir.
1994); Martin v. Commissioner, 52 T.C. 140, 144 (1969), affd. per
curiam 424 F.2d 1368 (9th Cir. 1970).  Therefore, we conclude
that the payment in the amount of $450,000 to discharge
petitioner's existing obligation under the guarantor agreement is
deductible under section 166 as a nonbusiness bad debt.[4]  Because
section 1.166-9(b), Income Tax Regs., provides that the guarantor
payments are a nonbusiness debt, we need not determine whether
petitioner sustained a theft loss.[5]

_____

[4]  Thus, if the payment is not deductible under another
section, petitioners may deduct the $450,000 only to the extent
of net capital gains plus $3,000 and may carry forward the
remaining capital loss to succeeding taxable years.  Secs. 1211
and 1212.  We note that respondent has allowed a $3,000 short-
term capital loss deduction for each of the years in issue.

We also note that petitioner makes no contention that the
$450,000 is deductible as a business bad debt.

[5]  We note that if there was a loss as a result of
misappropriations by Wheeler, it occurred before the years at
issue.  Under sec. 165(e), a theft loss is deductible in the
taxable year in which the taxpayer discovers the loss.
Additionally, even if there was a loss in the years at issue, it
was sustained by PEC and not by petitioners.  The record shows
(continued...)

Business Reputation

Petitioner argues that he may deduct the bankruptcy settlement payments under section 162 as expenses to protect his business reputation. Petitioner bases the deductibility of the payments upon the adverse business consequences that would have resulted to his medical practice from a failure to pay the default judgment and bankruptcy order. Generally, a taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on his trade or business. Sec. 162(a).

We have, however, concluded that the $450,000 payment is a nonbusiness debt. If a guarantor's payment is found to give rise to a debt, then the guarantor cannot deduct the payment as a business expense under section 162. Fincher v. Commissioner, 105 T.C. 126, 138-139 (1995); see Horne v. Commissioner, supra at 336. In that event, the guarantor can deduct the payment only when, and in the amount, permitted under section 166. See Horne v. Commissioner, supra at 335. We have determined that the guarantor payment is a nonbusiness debt and, therefore, the payment cannot be deductible under section 162.

NOL

---

[5](...continued)
that petitioner maintained PEC as an entity distinct from himself. Where the taxpayer has availed himself of the corporate form, this Court generally will not disregard the existence of the corporation in order to reduce the taxpayer's tax liability. Rink v. Commissioner, 51 T.C. 746, 752 (1969).

We must next determine whether the $450,000 payment is included in the NOL's available to petitioners from the bankruptcy estate for the 1990 taxable year. Section 172(c) defines "NOL" as the excess of deductions over the taxpayer's gross income, subject to modifications of section 172(d). In determining whether there is an excess of deductions over gross income, capital losses are allowed only to the extent of capital gains. Sec. 172(d). Net capital losses are excluded from the NOL computation by section 172(d)(2).

We have concluded that petitioner's $450,000 payment is deductible only as a nonbusiness bad debt. Under section 166(d), a nonbusiness bad debt is deductible only as a short-term capital loss. Therefore, we hold that petitioners are not entitled to include the payment in computing NOL's from petitioner's bankruptcy estate.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.