T.C. Summary Opinion 2001-18

UNITED STATES TAX COURT

STEVEN D. KUCERA AND TERESA M. KUCERA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10186-99S.           Filed February 27, 2001.

<u>Kent O. Littlejohn</u>, for petitioners.

<u>Lisa K. Hartnett</u>, for respondent.


DEAN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7463 of the Internal Revenue Code in
effect at the time the petition was filed.  The decision to be
entered is not reviewable by any other court, and this opinion
should not be cited as authority.  Unless otherwise indicated,
subsequent section references are to the Internal Revenue Code in
effect for the years in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies of $6,328, $4,018, and $1,571 in petitioners' Federal income taxes for tax years 1994, 1995, and 1996, respectively. The issues for decision are: (1) Whether petitioners' share of income from a partnership in 1994, 1995, and 1996 is attributable to the rental of property pursuant to written binding contracts entered into before February 19, 1988; (2) whether the issue of petitioner Steven D. Kucera's (petitioner) participation in Business Management Services, Inc. (BMS) is properly before the Court; and (3) if so, whether petitioner materially participated in BMS such that the rental income attributable to BMS should not be subject to the recharacterization rule of section 1.469-2(f)(6), Income Tax Regs.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners resided in Grand Island, Nebraska, at the time the petition was filed in this case.

Petitioner is a certified public accountant and has been during all years relevant in this case. Petitioner prepared joint Forms 1040, U.S. Individual Income Tax Returns, for himself and his wife, Teresa M. Kucera, for each of the years at issue.

Since at least July 1984, petitioner has conducted his accounting practice through a professional corporation (PC) along with several other accountants, with each accountant owning an equal percentage of the PC. During all relevant periods, petitioner was a material participant in the PC. The name of the PC has been amended on several occasions since its inception to properly reflect its practicing members and shareholders.

Petitioner has been a partner in a partnership known as the 1203 Partnership since at least July 1984. The 1203 Partnership is the owner of the real estate and office building located at 1203 West Second in Grand Island, Nebraska (1203 office building). During all relevant times, the ownership of the 1203 Partnership was held equally by the same individuals who were then shareholders of the PC. Although there have been changes in the partners of the 1203 Partnership, the partnership has never been dissolved, liquidated, or terminated.

Since at least July 1984, petitioner has been a shareholder of Business Management Services, Inc. (BMS), which was organized as a "C" corporation. BMS functions as a computer service bureau by preparing customers' payroll and computerized general ledgers. During all relevant times, the shareholders of BMS have been the same individuals as the shareholders in the PC, with up to two additional shareholders. The additional shareholders were neither accountants, nor owners of the PC. The officers and

directors of BMS are all members of the PC, but the officers and directors of BMS are not the same as those of the PC.

For all relevant years, the PC's business has been located in the 1203 office building pursuant to a lease between the PC and the 1203 Partnership. BMS's business also has been located in the 1203 office building pursuant to a lease between BMS and the 1203 Partnership. The spaces occupied by the PC and BMS within the 1203 office building are separate and distinct.

On May 1, 1986, the PC and the 1203 Partnership executed a document entitled "Real Estate Lease". The document states that the owner of the leased property is the 1203 Partnership and that the tenant is Larsen, Schroeder & Associates, PC.[1] The leased premises are the "Office building and parking lots at 1203 West Second Street and parking lot at 1219 West Second Street, * * * excepting that portion of said building occupied by Business Management Services." The term of the lease is "from May 1, 1986, to April 30, 1987, to be renewed automatically year to year on May 1", and the monthly rental is $5,580. The lease was signed on behalf of the 1203 Partnership by George Schroeder, General Partner, and on behalf of the PC by Tom Larsen, President.

---

[1] At this time, Tom Larsen, Matt Shonsey, George Schroeder, Bob Almquist, Bruce Schreiner, Phil Maltzahn, and petitioner were equal shareholders of the PC.

On May 1, 1989, the PC and the 1203 Partnership executed a document entitled "Real Estate Lease". The provisions of this document are identical to the 1986 document in all respects except that the name of the tenant was changed to Shonsey, Schroeder, Almquist, Schreiner, Kucera & Maltzahn, P.C.,[2] and the term of the lease is "from May 1, 1989, to April 30, 1990, to be renewed automatically year to year on May 1." Phil Maltzahn, General Partner, signed the document on behalf of the 1203 Partnership and Matthew Shonsey, President, signed it on behalf of the PC.

On May 1, 1990, the PC and the 1203 Partnership executed a document entitled "Real Estate Lease". The provisions in this document are identical to those in the 1989 document, except that the term of the lease is "from May 1, 1990 to April 30, 1991, to be renewed automatically year to year on May 1", and the rental amount was increased from $5,580 to $7,425. Phil Maltzahn and Matthew Shonsey once again signed the document on behalf of the parties.

On May 1, 1993, the PC and the 1203 Partnership executed a document entitled "Real Estate Lease". This document is identical to the 1990 document except that the name of the tenant

_____

[2] As of May 1, 1989, one of the PC shareholders' interest in the PC had been redeemed. The PC amended its Articles of Incorporation and changed its name to reflect the six individuals who were equal shareholders of the PC.

was changed to Shonsey, Almquist, Kucera, Maltzahn, and Galloway, PC,[3] and the lease term was changed to run "from May 1, 1993 to April 30, 1994, to be renewed automatically year to year on May 1."

On July 1, 1984, BMS and the 1203 Partnership executed a document entitled "Real Estate Lease".  The document was signed on behalf of the 1203 Partnership by Gary Fitit, General Partner, and on behalf of BMS by Danny Steele, President.  The lease agreement provides that BMS will lease "Office space consisting of one thousand two hundred seventy square feet, more or less, and parking lot in back of building located at 1203 West Second Street".  The term of the lease is from July 1, 1984 with "no ending term and the lease shall be offered by lessor and accepted by lessee from month to month."  The agreement provides for a monthly rental of $915.

On June 1, 1988, BMS and the 1203 Partnership executed a document entitled "Real Estate Lease".  The only differences in this document and the prior lease are that the term of the lease in the 1988 document is from June 1, 1988, and the document was signed by Phil Maltzhan, General Partner, on behalf of the 1203 Partnership and by Michael Martin, President, on behalf of BMS.

---

[3]  As of May 1, 1993, all the stock of two shareholders had been redeemed and one shareholder had been added to the ownership of the PC.  The name of the PC was changed to reflect the five individuals who were equal shareholders of the PC.

On November 1, 1989, BMS and the 1203 Partnership executed a document entitled "Real Estate Lease". This document indicates that the leased premises are "one thousand square feet, more or less, and parking lot in back of building" and that the monthly rental is $720. The term of the lease starts November 1, 1989. The document is signed by Phil Maltzahn, General Partner, on behalf of the 1203 Partnership and by Mike Martin, President, on behalf of BMS. There is a handwritten notation on the document stating "Current lease in effect".

Petitioners timely filed their 1994, 1995, and 1996 joint Federal income tax returns. On Part II of their Schedules E, Supplemental Income and Loss, petitioners reported income from the 1203 Partnership of $15,355, $11,933, and $4,920 for 1994, 1995, and 1996, respectively. This income consists of petitioner's share of the net rental income from the real estate and office building owned by the partnership.

During the 3 years at issue, petitioners owned several rental units which generated losses in each year. They also had passive activity loss carryovers from prior years. Petitioners offset the rental income received from the 1203 Partnership against passive losses from petitioners' other rental real estate. After consideration of the passive activity loss limitations, petitioners claimed passive activity losses in the

years 1994, 1995, and 1996 of $20,753, $18,151, and $4,920, respectively.

Respondent determined that the income from the 1203 Partnership was nonpassive income pursuant to the recharacterization rule of section 1.469-2(f)(6), Income Tax Regs. After consideration of the passive activity loss limitations, respondent determined that petitioners' passive activity losses were $412, $4,220, and $0 for 1994, 1995, and 1996, respectively. Respondent increased petitioners' taxable income for the years accordingly. As a result of respondent's adjustments, respondent reduced petitioners' itemized deductions in each year at issue and determined deficiencies in petitioners' income taxes of $6,328, $4,018, and $1,571 for the 1994, 1995, and 1996 respective tax years.

Petitioners do not challenge respondent's computations but argue that their rental income from the 1203 Partnership is passive income and not subject to the recharacterization rule of section 1.469-2(f)(6), Income Tax Regs.

## Discussion

Section 469 sets forth the passive activity loss rule which generally allows losses generated by passive activities to be offset only against gains from other passive activities. Section 469(c) defines a passive activity as any activity which involves the conduct of any trade or business and in which the taxpayer

does not materially participate.  Rental activity is generally
considered a passive activity.  See sec. 469(c)(2).

The Secretary, however, is expressly authorized to prescribe
regulations necessary or appropriate to carry out the provisions
of section 469, including regulations "which specify what
constitutes an activity, material participation, or active
participation" and "requiring net income or gain from a limited
partnership or other passive activity to be treated as not from a
passive activity".  Sec. 469(l)(1), (3).  Pursuant to this
authority, section 1.469-2(f)(6), Income Tax Regs.,
recharacterizes a taxpayer's rental income from property rented
for use in a trade or business in which the taxpayer materially
participates as income not from a passive activity.[4]  Section
1.469-11(c)(1)(ii), Income Tax Regs., however, excludes "the
portion of the income (if any) that is attributable to the

---

[4]  The regulation, in relevant part, provides:

> (f)(6) Property rented to a nonpassive activity.
> An amount of the taxpayer's gross rental activity
> income for the taxable year from an item of property
> equal to the net rental activity income for the year
> from that item of property is treated as not from a
> passive activity if the property–

> (i) Is rented for use in a trade or business
> activity * * * in which the taxpayer materially
> participates (within the meaning of § 1.469-5T)
> for the taxable year * * *[Sec. 1.469-2(f)(6),
> Income Tax Regs.]

rental of that item of property pursuant to a written binding contract entered into before February 19, 1988" from the recharacterization rule of section 1.469-2(f)(6), Income Tax Regs.

Petitioners contend that the lease agreements between the PC and the 1203 Partnership and between BMS and the 1203 Partnership in effect for the years in issue were both entered into before February 19, 1988, and therefore, income derived from the 1203 Partnership's rental activity is passive. They further argue that the 1203 Partnership's income from BMS's lease of office space is passive income regardless of which lease agreement was in effect for the years in issue because petitioner was not a material participant in BMS.

Respondent argues that new leases which changed material provisions of the original leases were executed after February 19, 1988. Respondent thus maintains that the net rental income from the 1203 Partnership in 1994, 1995, and 1996 was not attributable to leases entered into before February 19, 1988. Respondent further argues that petitioners have failed to properly bring before the Court the issue of petitioner's participation in BMS.

Lease Agreements

We first examine the lease agreements at issue. State law governs the nature of property rights, and Federal law determines

the appropriate tax treatment of those rights.  See United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985).  The agreements at issue were executed within the State of Nebraska by residents of Nebraska for the lease of property located in Nebraska.  We thus look to Nebraska law to determine the nature of the property rights created by the agreements.

Four lease agreements between the PC and the 1203 Partnership were executed from May 1, 1986, to May 1, 1993.  Each of the documents is a complete agreement entitled "Real Estate Lease" and covers all material terms of the lease.  Each of the agreements provides for a specified rental term of 1 year beginning on the date the agreement was executed and contains a provision that the lease is "to be automatically renewed year to year".

Many states recognize a distinction between an extension and a renewal of a lease.  See 51C C.J.S., Landlord and Tenant, sec. 54b, at 164 (1968); 49 Am.Jur.2d, Landlord and Tenant, sec. 141 (1995).  In such states, an extension creates on its own force an additional term, and the same lease continues in force during the additional period.  See 51C C.J.S., Landlord and Tenant, sec. 54b, at 164 (1968); 49 Am.Jur.2d, Landlord and Tenant, sec. 141 (1995).  In contrast, a renewal requires the execution of a new lease and is regarded as a separate contract.  See 51C C.J.S., Landlord and Tenant, sec. 54b, at 164 (1968); 49 Am.Jur.2d,

Landlord and Tenant, sec. 141 (1995).  It appears that Nebraska recognizes such a distinction.  In Mauzy v. Elliott, 22 N.W.2d 142, 147 (Neb. 1946), the Supreme Court of Nebraska quoting 35 C.J., Landlord and Tenant, sec. 178 at 1037, stated that "each renewed lease is a new lease, and the taking of it operates as a surrender of the old one."  The court further noted that the original lease could be considered to be continued only for the protection of certain "legal interests carved out of it, which, once created, the law will not permit to be destroyed".  Id.; see also Bishop Cafeteria Co. v. Ford, 129 N.W.2d 581, 588-589 (Neb. 1964).

The use of the words "renewal" or "extension" in a lease, however, may not be conclusive as to whether a lease grants a covenant to renew or an agreement to extend.  See 51C C.J.S., Landlord and Tenant, sec. 54b at 165 (1968); 49 Am.Jur.2d, Landlord and Tenant, sec. 143 (1995).  Instead, the terms of the lease and the parties' conduct may indicate that the parties intended to continue for a subsequent term under the original lease.  See 51C C.J.S., Landlord and Tenant, sec. 54b at 165 (1968); 49 Am.Jur.2d, Landlord and Tenant, sec. 143 (1995).

With respect to the 1986 lease agreement between the PC and the 1203 Partnership, the automatic nature of the renewal provision suggests that the parties intended that the lease be extended rather than renewed in subsequent years.  The fact that

no new agreement was executed until 3 years later supports such a determination.  Having determined that the 1986 agreement's automatic renewal provision extended the agreement to subsequent years, we now consider the agreements executed after the 1986 agreement.

Under Nebraska law "'A contract complete in itself will be conclusively presumed to supersede and discharge another one made prior thereto between the same parties concerning the same subject matter, where the terms of the latter are inconsistent with those of the former, so they cannot subsist together.'"  The Nebraskans, Inc. v. Homan, 294 N.W.2d 879, 881 (Neb. 1980) (quoting In re Estate of Wise, 13 N.W.2d 146 (Neb. 1944)(syllabus of the court)); Goings v. Gerken, 263 N.W.2d 655 (Neb. 1978).  In such case, "a merger of the agreements" occurs.  The Nebraskans, Inc. v. Homan, supra.  The parties' intent to discharge an old agreement through the execution of a new agreement must clearly appear.  See DeFilipps v. Skinner, 320 N.W.2d 737, 739 (Neb. 1982); In re Estate of Wise, supra.  "An inspection of the contracts, together with examination of the circumstances, may show that the later contract was intended as supplementary to the first."  DeFilipps v. Skinner, supra at 739.

Petitioners argue that the original agreement remained in effect for the years at issue and quote Moudry v. Parkos, 349 N.W. 2d 387, 389 (Neb. 1984), for the proposition that a year-to-

year tenancy can be terminated under Nebraska law only "by an agreement of the parties, express or implied, or by notice given, six calendar months ending with the period of the year at which the tenancy commenced."  Regardless of whether the automatic renewal provision created a year-to-year tenancy,  however, the parties agreed to discharge the initial agreement when they executed the 1990 real estate lease.[5]

The 1990 agreement increased the monthly rental price from $5,580 to $7,425.  The rental price is a material term of the lease and is inconsistent with the rental price stated in the May 1, 1986, agreement.  See Cooperative Refinery Association v. Consumers Pub. Power Dist., 190 F.2d 852, 858 (8th Cir. 1951); The Nebraskans, Inc. v. Homan, supra.  The parties' intent to replace their earlier agreement is evident in the 1990 agreement itself.  The document is entitled "Real Estate Lease", it includes all material terms of the lease, and it was signed by a

---

[5]  The 1989 and 1993 agreements reflect changes in the PC's name.  Respondent argues that the changes in the professional corporation's name constitute changes in a party to the lease.  A professional corporation, however, is a legal entity separate from its shareholders and officers.  See Neb. Rev. Stat. sec. 21-2203 (1997); United States Natl. Bank v. Rupe, 296 N.W.2d 474 (Neb. 1980).  A change in a professional corporation's name does not change the underlying entity.  See Neb. Rev. Stat. secs. 21-2204, 21-20,116, 21-20,124 (1997).  Likewise, changes in the ownership of the 1203 Partnership do not amount to a change in a party to the lease.  See Neb. Rev. Stat. secs. 67-306(1), 67-330 (1996); Ravenna Bank v. Custom Unlimited, 391 N.W.2d 557, 561-562 (Neb. 1986); Bailey v. McCoy, 193 N.W.2d 270, 273 (Neb. 1971).

general partner of the 1203 Partnership and by the president of the PC.

In contrast to the contracts at issue in In re Estate of Wise, supra, where the Supreme Court of Nebraska determined that a subsequent contract was intended to supplement an earlier contract, the 1990 agreement makes no reference to any earlier agreements executed between the PC and the 1203 Partnership. The 1990 agreement is complete in and of itself. As a contract complete in itself, varying a material term, the 1990 agreement replaces the 1986 agreement.

The 1203 Partnership's rental income from the PC during the years in issue, therefore, is not attributable to a written binding contract entered into before February 19, 1988.

With respect to the three lease agreements between BMS and the 1203 Partnership executed from July 1, 1984, to November 1, 1989, petitioners make the same arguments as with the PC rental agreements. The BMS agreements, however, are distinguishable in that they create month-to-month tenancies. Each agreement provides that the term of the lease is from the date on which the agreement was executed and further provides: "There shall be no ending term and the lease shall be offered by lessor and accepted by lessee from month to month."

In some jurisdictions, a month-to-month tenancy is considered a continuous tenancy, and in some it is considered a

recurring tenancy. See 51C C.J.S., Landlord and Tenant, sec. 145 at 438 (1968); 49 Am.Jur.2d, Landlord and Tenant, sec. 130 (1995). In those jurisdictions that view the tenancy as recurring, the tenancy ends and recommences at the expiration of every month. See 51C C.J.S., Landlord and Tenant, sec. 145 at 438 (1968). It is not clear from the case law whether Nebraska views a month-to-month tenancy as continuous or recurring. Nevertheless, we find that the initial agreement between the Partnership and BMS was replaced by the November 1, 1989, agreement.

The 1989 agreement decreased the monthly rental from $915 to $720. It also decreased the office space rented from approximately 1,270 square feet to approximately 1,000 square feet.[6] These changes to the material terms of the lease incorporated in a complete contract executed by the parties are inconsistent with the initial agreement between the parties. The intent of the parties that the 1989 agreement supercede the earlier agreement is evident in the documents themselves.

Thus, the rental income received by the 1203 Partnership from BMS during the years in issue is not attributable to a written binding contract entered into before February 19, 1988.

---

[6] Because the space rented by the PC was described as the 1203 office building, "except that portion of said building occupied by Business Management Services", the decrease in the space rented by BMS resulted in an increase in the space rented by the PC.

## Material Participation

Even if petitioners' income is not attributable to property leased under a written binding contract entered into before February 19, 1988, petitioners argue that a portion of the income is nevertheless passive income because petitioner was not a material participant in BMS.  Respondent objects to petitioners' argument, asserting that petitioners have not properly raised this issue before the Court and that, in any case, petitioners have failed to establish that the 1203 Partnership's lease relationship with BMS constitutes a separate activity from its lease relationship with the PC.

Rule 34 requires that the petition contain clear and concise assignments of each and every error alleged and statements of facts on which petitioner relies to sustain each assignment of error.  See Rule 34(b)(4) and (5).  The purpose underlying the Court's pleadings requirements is to give the parties and the Court fair notice of the matters in controversy.  See Rule 31(a).  Generally, issues not raised in the assignments of error in the petition are deemed conceded.  See Rule 34(b)(4).  Nevertheless, it is within the discretion of the Court to determine whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent

evidence. See <u>Ware v. Commissioner</u>, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990).

It is clear that petitioners did not provide notice in their petition of an intent to challenge the extent of petitioner's participation in BMS. Their petition states their disagreement with respondent's determination in the notice of deficiency solely as follows:

> We disagree with the adjustment based on Reg. Sec. 1.469-11(c)(1)(ii). The income from the "1203 Partnership" was attributable to the rental of property pursuant to a written binding contract entered into before February 19, 1988, and thus was properly reported as passive income.

Petitioners never amended their petition to raise or assert any other issue. No pretrial memoranda were filed by either party. Counsel for petitioners first raised the issue of petitioner's participation in BMS in his opening statement. Nevertheless, petitioners argue that respondent should have been on notice that petitioner's participation in BMS was at issue because petitioners stipulated that petitioner was a material participant in the PC but did not make such a stipulation with regard to BMS.

Although the recharacterization rule applies only to a taxpayer's rental income from property rented for use in a trade or business in which the taxpayer materially participates, see sec. 1.469-2(f)(6), Income Tax Regs., rules governing the grouping of activities prohibit a partner from treating

activities grouped together by a section 469 entity as separate activities; see sec. 1.469-4(c)(5), Income Tax Regs. Therefore, if the 1203 Partnership grouped its rentals to the PC and to BMS as a single activity, petitioners are not at liberty to treat the income from the rentals as from two separate activities. If the rentals constitute a single activity, it is irrelevant whether petitioner was a material participant in BMS. His material participation in the PC is sufficient to recharacterize all of his share of the 1203 Partnership's income.

Under these circumstances, the fact that the parties made no stipulation regarding petitioner's participation in BMS would not give respondent notice that petitioners intended to contest this issue. Respondent, however, did not object to testimony elicited from the PC's president concerning petitioner's involvement with BMS. When issues not raised by the pleadings are tried by implied consent of the parties, the issues are treated as if they had been raised in the pleadings. See Rule 41(b). Failure to amend the pleading, does not affect the result of the trial of these issues. See id. When petitioner introduced the issue at trial and respondent acquiesced in the introduction of evidence on that issue without objection, Rule 41(b) was satisfied. See Parekh v. Commissioner, T.C. Memo. 1998-151; Chiu v. Commissioner, T.C. Memo. 1997-199. We, therefore, consider

whether the portion of rental income attributable to the BMS lease is exempt from recharacterization.

Material participation is defined as involvement in the operations of an activity on a regular, continuous, and substantial basis. See sec. 469(h)(1). A taxpayer materially participates in an activity if he satisfies one of seven tests provided in the regulations. See sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988); see also Mordkin v. Commissioner, T.C. Memo. 1996-187.

Matthew Shonsey was petitioners' sole witness. When asked whether he was familiar with the people who rendered "services for Business Management Services to its clients", he identified four individuals as "programmers that rendered the major services." Mr. Shonsey then was asked whether petitioner ever rendered any services for BMS. He responded "No." He further testified that BMS does not have the same officers and directors as the PC; however, he did not indicate whether petitioner was a director or officer of BMS.

We are not persuaded by Mr. Shonsey's testimony that petitioner did not provide any services for BMS. It is unclear whether Mr. Shonsey intended to testify that petitioner did not render services for BMS's clients or whether he did not provide any services for BMS. Further, he failed to provide specific information about the management of BMS. Under these circumstances, petitioners have failed to establish that

petitioner was not a material participant in BMS. See 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).

Regardless of whether petitioner materially participated in BMS, petitioners have not provided any evidence that the 1203 Partnership treated their rentals to the PC and to BMS as separate activities. If the 1203 Partnership grouped its rentals to the PC and to BMS as a single activity, petitioners may not treat the income from the rentals as from two separate activities. See sec. 1.469-4(c)(5), Income Tax Regs. Under the general rules for grouping activities, one or more rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469. See 1.469-4(c)(1), Income Tax Regs. The facts and circumstances used to determine whether activities constitute an appropriate economic unit all point toward the two rentals' being considered one economic unit. See sec. 1.469-4(c)(2), Income Tax Regs.

Accordingly, we uphold respondent's determination that all of petitioners' income from the 1203 Partnership is not from a passive activity pursuant to the recharacterization rule of section 1.469-2(f)(6), Income Tax Regs.

Reviewed and adopted as the report of the Small Tax Case Division.

Decision will be entered

for respondent.