126 T.C. No. 10

UNITED STATES TAX COURT

ROBERT J. MERLO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21538-03.              Filed April 25, 2006.

        P exercised incentive stock options on Dec. 21,
2000, acquiring 46,125 shares of E stock.  As a result,
under I.R.C. secs. 55(b)(2), 56(b)(3), and 83(a), P was
required to include $1,066,064, the spread between the
exercise price and the fair market value of the shares
of E stock on the date of exercise, in his alternative
minimum taxable income in 2000.  Instead, P included
only $452,025, the spread between the exercise price
and the fair market value of the shares of E stock on
Apr. 15, 2001.

        In 2001, E filed for bankruptcy, and P's shares of
E stock became worthless.  Under I.R.C. sec. 165(g)(1),
P realized a capital loss for alternative minimum tax
purposes of $1,075,289 in 2001.

        R determined a deficiency of $169,510 in P's 2000
Federal income tax.  P maintains that the capital loss
limitations of I.R.C. secs. 1211 and 1212 do not apply
for purposes of the alternative minimum tax.  As a

result, P argues that he may use his capital losses realized in 2001 to reduce his alternative minimum taxable income in 2000.

Held: The capital loss limitations of I.R.C. secs. 1211 and 1212 apply for purposes of calculating alternative minimum taxable income.

Held, further: P's capital losses realized in 2001 do not create an ATNOL that can be carried back to reduce his alternative minimum taxable income in 2000.

Don Paul Badgley, Brian G. Isaacson, and Duncan C. Turner, for petitioner.

Julie L. Payne and Kirk M. Paxson, for respondent.

OPINION

HAINES, Judge: Respondent determined deficiencies in petitioner's Federal income taxes of $4,833 and $169,510 for the years 1999 and 2000, respectively. After concessions,[1] the issues for decision are: (1) Whether the capital loss limitations of sections 1211 and 1212 apply to the calculation of alternative minimum taxable income (AMTI); and (2) whether

_____

[1] Petitioner concedes respondent's disallowance of a loss of $21,871 claimed on Schedule E, Supplemental Income and Loss, in 1999 and respondent's allowance of additional itemized deductions of $6,797 in 1999.

petitioner may use capital losses realized in 2001 to reduce his AMTI in 2000.[2]

Background

The parties submitted this case fully stipulated pursuant to Rule 122. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Dallas, Texas.

During 1999 and 2000, petitioner was employed by Service Metrics, Inc. (SMI). On July 2, 1999, petitioner was named vice president of marketing for SMI. On July 14, 1999, petitioner and SMI entered into a stock option agreement (SMI stock option agreement) in which SMI granted petitioner options to purchase 275,000 shares of SMI common stock with an exercise price of 10 cents per share. The stock options granted to petitioner qualified as incentive stock options (ISOs) under section 422.

On November 19, 1999, petitioner entered into an employment agreement with Exodus Communications, Inc. (Exodus). On November 23, 1999, Exodus acquired SMI. As a result, Exodus converted petitioner's options to purchase shares of SMI common stock to options to purchase shares of Exodus common stock.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

On December 21, 2000, petitioner exercised an option to purchase 46,125 shares of Exodus common stock at 20 cents per share, for a total exercise price of $9,225. The price of the optioned stock on the NASDAQ on December 21, 2000, was $23.3125 per share, for a total fair market value of $1,075,289 on the date of exercise. Petitioner was not a dealer in securities but instead was acting as an investor when he exercised the ISOs.

Exodus filed for bankruptcy on September 26, 2001. In a press release dated November 21, 2001, Exodus announced that the company's common stock had no value. Petitioner's shares of Exodus stock were worthless as a result of Exodus's bankruptcy.

Petitioner timely filed a Federal income tax return for 2000. On the return, petitioner reported $248,585 in wages, $432 in taxable interest, $11,311 in dividends, and $319,614 in capital gain, for total income of $579,942. Petitioner claimed itemized deductions of $31,213 and reported taxable income of $548,729 and regular tax liability of $134,455. Petitioner also reported alternative minimum tax (AMT) liability of $116,973, for a total tax of $251,428.

Attached to petitioner's 2000 tax return was Form 6251, Alternative Minimum Tax--Individuals. On line 10, petitioner reported excess AMTI over regular tax income of $452,025 as a result of his exercise of the Exodus ISOs. Instead of using the spread between the exercise price and the fair market value of

the Exodus shares on the date of exercise, December 21, 2000, petitioner used the fair market value of the Exodus shares on April 15, 2001, to calculate the excess AMTI.[3] Petitioner reported AMTI of $1,001,776 and tentative minimum tax (TMT) of $251,428. By subtracting his regular tax from the TMT, petitioner calculated an AMT of $116,973. Petitioner did not report an alternative tax net operating loss (ATNOL or AMT NOL) deduction on Form 6251.

On November 13, 2003, respondent sent a notice of deficiency to petitioner. Respondent determined that petitioner was required to use the fair market value of the Exodus shares on the date of exercise (December 21, 2000) instead of their value on the date reported by petitioner (April 15, 2001) to calculate his AMTI. As a result, respondent increased petitioner's AMTI from $1,001,776 to $1,607,166, his AMT from $116,973 to $286,483, and his total tax from $251,428 to $420,938.[4] Accordingly,

---

[3] Petitioner used the Apr. 15, 2001, fair market value on the basis of proposed legislation that would have allowed taxpayers to use the fair market value of shares on Apr. 15, 2001, instead of the fair market value on the date of exercise, in calculating the spread between exercise price and fair market value. See H.R. 2794, 107th Cong., 1st Sess. (2001). The proposed legislation was never enacted.

[4] There is a slight discrepancy between the fair market value of the Exodus shares as reported by respondent in the notice of deficiency ($23.25 per share) and as stipulated by the parties ($23.3125 per share). As a result, respondent's calculations in the notice of deficiency are inconsistent with the facts as stipulated. For purposes of consistency, we

(continued...)

respondent determined a deficiency in petitioner's Federal income tax of $169,510 for 2000.

On December 4, 2003, petitioner attempted to file an amended Federal income tax return for 2000. On the amended return, petitioner reported a net decrease in tax of $116,973. The change was based on the theory that, under section 83, petitioner was not required to recognize AMTI on the exercise of his ISOs because his rights to the shares of Exodus stock were subject to substantial risk of forfeiture and were nontransferable. Respondent did not accept petitioner's amended return.

On December 18, 2003, petitioner filed his petition with this Court.

On December 27, 2004, respondent filed a motion for partial summary judgment. In the motion, respondent asked the Court to find that petitioner's rights to his shares of Exodus stock were not subject to a substantial risk of forfeiture.

On December 28, 2004, petitioner filed a cross-motion for partial summary judgment. In the motion, petitioner asked the Court to find that: (1) Petitioner's rights to his shares of Exodus stock were subject to a substantial risk of forfeiture and were nontransferable; and (2) in the alternative, petitioner is

---

[4](...continued)
hereinafter use the fair market value as stipulated by the parties. However, we direct the parties to address this discrepancy and to resolve any impact it may have on petitioner's deficiency as part of their Rule 155 calculations.

entitled to ATNOL deductions under section 56(d) and is allowed a 2-year carryback of those ATNOLs.

The Court issued a Memorandum Opinion on July 20, 2005, ruling on the cross-motions for partial summary judgment. See Merlo v. Commissioner, T.C. Memo. 2005-178. The Court held that petitioner's rights to his shares of Exodus stock were not subject to a substantial risk of forfeiture. The Court further held that genuine issues of material facts existed as to whether petitioner was entitled to carry back an ATNOL deduction under section 56(d). Accordingly, the Court issued an order on July 26, 2005, granting respondent's motion and denying petitioner's cross-motion.

Discussion

The issues in the instant case revolve around petitioner's exercise of ISOs to acquire shares of Exodus stock in 2000, and the impact, if any, the worthlessness of those shares in 2001 has on the calculation of petitioner's AMTI in 2000.

A.  The Alternative Minimum Tax and Its Impact on the Exercise of Incentive Stock Options

Generally, under section 421(a), a taxpayer is allowed to defer regular tax on income resulting from the exercise of ISOs until the taxpayer later sells the stock. However, ISOs are treated differently in calculating the taxpayer's AMTI and AMT liability. See secs. 55(b)(2), 56(b)(3).

The Internal Revenue Code imposes upon taxpayers an AMT in addition to all other taxes imposed by subtitle A. See sec. 55(a). The AMT is imposed upon the taxpayer's AMTI, which is an income base broader than the base of taxable income applicable for Federal income taxes in general. Allen v. Commissioner, 118 T.C. 1, 5 (2002); see also H. Conf. Rept. 99-841 (Vol. II), at II-249 (1986), 1986-3 C.B. (Vol. 4) 1, 249, 264. AMTI is defined as the taxable income of a taxpayer for the taxable year, determined with adjustments provided in sections 56 and 58, and increased by the amount of items of tax preference described in section 57. Sec. 55(b)(2).

As applicable to the instant case, for purposes of computing a taxpayer's AMTI, section 56(b)(3) provides that section 421 shall not apply to the transfer of stock acquired pursuant to the exercise of an ISO, as defined by section 422. Therefore, under the AMT rules, shares of stock acquired pursuant to the exercise of an ISO are treated as shares of stock acquired pursuant to a nonqualified stock option (NSO) under section 83. See sec. 56(b)(3); sec. 1.83-7(a), Income Tax Regs.; see also Speltz v. Commissioner, 124 T.C. 165, 178-179 (2005).

Under section 83, a taxpayer generally must recognize income when he exercises an NSO to the extent that the fair market value of the shares of stock transferred to him exceeds the price he pays at the time he exercises the option, so long as the

taxpayer's rights in the shares are transferable or not subject to a substantial risk of forfeiture.  Sec. 83(a); <u>Tanner v. Commissioner</u>, 117 T.C. 237, 242 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003); sec. 1.83-7(a), Income Tax Regs.  Pursuant to sections 55(b)(2), 56(b)(3), and 83(a), the taxpayer is required to include this income in his AMTI.

As a result of the AMT treatment of the exercise of ISOs, the taxpayer can have two different bases in the same shares of stock.  The taxpayer's regular tax basis will be the exercise price, or cost basis.  See sec. 1012.  However, for AMT purposes, section 56(b)(3) provides that the adjusted basis of any stock acquired by the exercise of an ISO "shall be determined on the basis of the treatment prescribed by this paragraph."  Thus, the taxpayer will increase his adjusted AMT basis by the amount of income included in his AMTI.  See secs. 55(b)(2), 56(b)(3), 83(a).

The parties stipulate that petitioner's stock options qualify as ISOs under section 422.  For regular tax purposes, section 421(a) allows petitioner to defer recognition of income until he later sells the stock.  Under section 1012, petitioner's regular tax basis in the shares of Exodus stock is the exercise price, $9,225.[5]

---

[5]  To avoid confusion between petitioner's different bases, we shall refer to petitioner's basis for regular tax purposes as
(continued...)

However, for AMT purposes, petitioner must include in his AMTI the spread between the exercise price and the fair market value of the shares of Exodus stock on the date of exercise. See secs. 55(b)(2), 56(b)(3), 83(a). We find that petitioner must include $1,066,064 in his AMTI for 2000.[6] As a result, petitioner's adjusted AMT basis in the shares of Exodus stock is increased by the amount recognized to $1,075,289.

Next, we consider whether petitioner may reduce his AMTI in 2000 as a result of the AMT capital loss realized in 2001.

B.   Capital Losses Under Regular Tax and Alternative Minimum Tax

If securities which are capital assets (as defined by section 1221) become worthless during a taxable year, any losses resulting therefrom are treated as capital losses, as if a sale or exchange of the securities occurred on the last day of that taxable year. Sec. 165(g)(1). Section 165(f) provides that capital losses are allowed only to the extent allowed in sections 1211 and 1212.

---

[5](...continued)
his "regular tax basis" and to his basis for AMT purposes as his "adjusted AMT basis".

[6]   $1,075,289 (fair market value of petitioner's shares of exodus stock on 12/21/00) less $9,225 (total exercise price) equals $1,066,064.

Under section 1211(b), noncorporate taxpayers can recognize capital losses only to the extent of capital gains plus $3,000.[7] Section 1212(b) allows noncorporate taxpayers to carry forward unrecognized capital losses to subsequent taxable years, but it does not allow such taxpayers to carry back unrecognized capital losses to prior taxable years.

The Internal Revenue Code does not explicitly address the treatment of capital losses for AMT purposes. See secs. 55-59, and accompanying regulations.

The parties stipulated that petitioner is not a dealer and that he exercised the ISOs as an investor. There is no dispute that petitioner's shares of Exodus stock are capital assets under section 1221. Because those shares became worthless in 2001, petitioner realized a capital loss in 2001. See sec. 165(g)(1). Petitioner's regular tax basis in the shares of Exodus stock was $9,225, resulting in a realized regular capital loss of $9,225.[8]

---

[7] For married individuals filing separately, $3,000 is reduced to $1,500. Sec. 1211(b)(1). If the excess of capital losses over capital gains is less than $3,000 (or $1,500), then only that excess may be deducted. Sec. 1211(b)(2).

[8] To avoid confusion between petitioner's capital losses, we shall refer to his capital loss for regular tax purposes as his "regular capital loss", and shall refer to his capital loss for AMT purposes as his "AMT capital loss".

However, the capital loss limitations of sections 1211(b) and 1212(b) limit petitioner's ability to recognize the regular capital loss.[9]

Petitioner's adjusted AMT basis in the shares of Exodus stock was $1,075,289, resulting in realized AMT capital loss of $1,075,289. Petitioner seeks to carry back his AMT capital loss to reduce his AMTI in 2000. Petitioner argues that the capital loss limitations of sections 1211 and 1212 do not apply to his AMT capital loss for purposes of calculating his AMTI.

This Court has never addressed whether the capital loss limitations of sections 1211 and 1212 apply for purposes of calculating a taxpayer's AMTI. However, section 1.55-1(a), Income Tax Regs., states:

> Except as otherwise provided by statute, regulations, or other published guidance issued by the Commissioner, all Internal Revenue Code provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer.

We find no statute, regulation, or other published guidance that purports to change the treatment of capital losses for AMT purposes.[10] See secs. 55-59 (and accompanying regulations).

---

[9] The effect of the capital loss limitations of secs. 1211(b) and 1212(b) for regular tax purposes is not in issue, and thus, is not discussed in detail.

[10] Petitioner argues that because the instructions to line 9 of Form 6251 for 2000 do not mention sec. 1211, the instructions indicate that sec. 1211 does not apply for purposes

(continued...)

Therefore, we hold that the capital loss limitations of sections 1211 and 1212 apply in calculating a taxpayer's AMTI.  See sec. 1.55-1(a), Income Tax Regs.; see also Allen v. Commissioner, 118 T.C. at 8 (holding that the wage-expense limitation of section 280C(a) applies to the calculation of AMTI where nothing in the sections relating to the wage-expense limitation or in the AMT provisions indicates otherwise).  Accordingly, we find that petitioner cannot carry back his AMT capital loss realized in 2001 to reduce his AMTI in 2000.

C.  Net Operating Losses and Alternative Tax Net Operating Losses

In an attempt to carry back his AMT capital loss, petitioner argues that the AMT capital loss entitles him to an ATNOL deduction under section 56.

Generally, a taxpayer may carry back a net operating loss (NOL) to the 2 taxable years preceding the loss, then forward to each of the 20 taxable years following the loss.[11]  Sec.

_____

[10](...continued) of calculating petitioner's AMTI.  We do not need to consider whether petitioner's interpretation of the instructions is correct.  It is settled law that taxpayers cannot rely on informal IRS instructions to justify a reporting position that is otherwise inconsistent with the controlling statutory provisions. Johnson v. Commissioner, 620 F.2d 153, 155 (7th Cir. 1980), affg. T.C. Memo. 1978-426; Graham v. Commissioner, T.C. Memo. 1995-114; Jones v. Commissioner, T.C. Memo. 1993-358.

[11]  In the case of NOLs incurred in 2001 or 2002, sec. 172(b)(1)(H) creates a 5-year carryback.  Petitioner argues that he is entitled to relief from the 5-year carryback. However,

(continued...)

172(b)(1)(A). Section 172(c) defines an NOL as "the excess of the deductions allowed by this chapter over the gross income," as modified under section 172(d). In the case of a noncorporate taxpayer, the amount deductible on account of capital losses shall not exceed the amount includable on account of capital gains. Sec. 172(d)(2)(A); sec. 1.172-3(a)(2), Income Tax Regs. The effect of section 172(d)(2)(A) is that net capital losses are excluded from the NOL computation. See Parekh v. Commissioner, T.C. Memo. 1998-151.

For AMT purposes, section 56(a)(4) provides that an ATNOL deduction shall be allowed in lieu of an NOL deduction under section 172. An ATNOL deduction is defined as the NOL deduction allowable under section 172 and is computed by taking into consideration all the adjustments to taxable income under sections 56 and 58 and all the preference items under section 57 (but only to the extent that the preference items increased the NOL for the year for regular tax purposes).[12] Sec. 56(d)(1).

Petitioner's net regular capital loss is excluded from computing his NOL deduction. See sec. 172(c), (d)(2)(A); sec. 1.172-3(a)(2), Income Tax Regs. For AMT purposes, petitioner's

---

[11](...continued)
because we conclude infra that petitioner is not entitled to an ATNOL, petitioner's argument is moot.

[12] Sec. 56(d)(1)(A) also limits the amount of the allowable ATNOL deduction; this is not in issue.

ATNOL is the same as his NOL, taking into consideration all the adjustments to his taxable income under sections 56, 57, and 58. See sec. 56(a)(4), (d)(1). No adjustments under those sections modify the exclusion of net capital losses from the NOL computation under section 172(d)(2)(A). Therefore, petitioner's net AMT capital loss is excluded for purposes of calculating his ATNOL deduction. As a result, petitioner's AMT capital loss realized in 2001 does not create an ATNOL that can be carried back to 2000 under sections 56 and 172(b).

D.    Petitioner's Other Arguments

Petitioner raises various other arguments in an attempt to carry back his 2001 AMT capital loss to reduce his 2000 AMTI. Petitioner's additional arguments can be categorized into three groups:  (1) Arguments premised on misinterpretations and misapplications of the Code sections outlined above; (2) arguments based on congressional intent; and (3) arguments based on equity and public policy.

As outlined above, the applicable Code sections do not allow petitioner to carry back his AMT capital loss, and arguments misinterpreting and misapplying those sections will not be addressed individually.

Petitioner asserts that "the intent of Congress in imposing an AMT tax on deferral preferences [including ISOs] was to accelerate the taxation of economic income without creating an

additional tax liability." Petitioner argues that the only way to comply with congressional intent is to allow him to carry back his AMT capital loss. Throughout his opening brief and reply brief, petitioner focuses heavily on his interpretation of congressional intent to support various arguments.

Petitioner relies on the Senate report to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, as authority for the asserted congressional intent. See S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1. Petitioner does not offer a specific citation but instead cites the Senate report generally. The Senate report addresses the AMT provisions on pages 515-540. Id. at 515-540, 1986-3 C.B. (Vol. 3) at 515-540. The Senate report does not directly support petitioner's interpretation of congressional intent, and we find no language supporting an inference of such intent. See id. Therefore, we do not further consider petitioner's arguments based on his interpretation of congressional intent.

Petitioner also advances several "policy and legal considerations". Essentially, petitioner is arguing that, under principles of equity, he should be allowed to carry back his AMT capital loss to reduce his AMTI. Petitioner feels that applying the capital loss limitations of sections 1211 and 1212 to the calculation of his AMTI results in harsh and unfair tax consequences.

This Court has previously stated:

> The unfortunate consequences of the AMT in various circumstances have been litigated since shortly after the adoption of the AMT.  In many different contexts, literal application of the AMT has led to a perceived hardship, but challenges based on equity have been uniformly rejected. * * *
>
> * * * "it is not a feasible judicial undertaking to achieve global equity in taxation * * *.  And if it were a feasible judicial undertaking, it still would not be a proper one, equity in taxation being a political rather than a jural concept." * * * the solution must be with Congress.

Speltz v. Commissioner, 124 T.C. at 176 (quoting Kenseth v. Commissioner, 259 F.3d 881, 885 (7th Cir. 2001), affg. 114 T.C. 399 (2000)); see also Alexander v. Commissioner, 72 F.3d 938 (1st Cir. 1995), affg. T.C. Memo. 1995-51; Okin v. Commissioner, 808 F.2d 1338 (9th Cir. 1987), affg. T.C. Memo. 1985-199; Warfield v. Commissioner, 84 T.C. 179 (1985); Huntsberry v. Commissioner, 83 T.C. 742, 747-753 (1984).  Petitioner's equity and public policy arguments offer no relief from the tax consequences of the AMT Code sections, as outlined above.

On the basis of the above, we hold that petitioner cannot carry back his AMT capital loss realized in 2001 to reduce his AMTI in 2000.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.