T.C. Memo. 2006-168

UNITED STATES TAX COURT

MARK SPITZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4075-05.                   Filed August 15, 2006.

<u>Don Paul Badgley</u> and <u>Brian Gary Isaacson</u>, for petitioner.

<u>Kirk M. Paxson</u> and <u>Julie L. Payne</u>, for respondent.

MEMORANDUM OPINION

HAINES, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes of $183,743 and $76,227 as well as additions to tax under section 6662 of $36,749 and $15,245 for 2000 and 2001 (years at issue), respectively.[1]

--------

[1] Unless otherwise indicated, all section references are to
(continued...)

After concessions,[2] the issues for decision are:  1) Whether the capital loss limitations of section 1211 apply to the computation of alternative minimum taxable income (AMTI); (2) whether alternative minimum tax (AMT) capital losses incurred in 2001 and 2002 can be carried back as an alternative tax net operating loss (ATNOL) to reduce AMTI in 1999, 2000, and 2001; and; (3) whether petitioner is liable for accuracy-related penalties under section 6662 for the years at issue.

## Background

The parties submitted this case fully stipulated pursuant to Rule 122.  The stipulation of facts, first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.  Petitioner resided in San Jose, California, when he filed the petition.

---

[1](...continued)
the Internal Revenue Code (Code), as amended.  All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  Amounts are rounded to the nearest dollar.

[2] The parties filed a stipulation of settled issues. Petitioner concedes the reduction in wages of $134,023 and denial of $204,709 of itemized deductions for 2000.  Respondent concedes that the correct deficiency for 2000 is $175,365; and assuming the Government's position is sustained, respondent concedes the correct penalty under sec. 6662 is $35,073.

For 2001, respondent concedes that petitioner is entitled to an itemized deduction for State income taxes of $224,879 and that the prior year minimum tax credit in 2001 is contingent on petitioner's 2000 tax liability.

A.  Incentive Stock Options

Petitioner began employment with Seagate Software, Inc. (Seagate), on March 6, 1995.  After Veritas Software Corp. (Veritas) acquired Seagate on May 28, 1999, petitioner stayed on as a full-time employee of Veritas until April 23, 2001.

As part of his compensation from both companies, petitioner was granted options to acquire common stock, all of which qualified as incentive stock options (ISO).  Petitioner's Seagate ISOs were converted to Veritas ISOs when Veritas took over Seagate, but the converted ISOs continued to be governed by the original Seagate stock option grants and retained the Seagate grant number.  Petitioner was granted additional ISOs by Veritas which were governed by the Veritas 1993 Equity Incentive Stock Option Plan.

Petitioner was not a dealer or trader in securities.  He exercised Veritas ISOs and acquired 34,948 shares in a series of transactions beginning November 30, 1999, and ending May 1, 2001. Petitioner paid $115,954 to exercise the ISOs and acquired the shares, which had a fair market value (FMV) of $4,476,973 at the various dates of exercise.  Between February 28, 2000, and December 27, 2002, petitioner sold all of the Veritas shares acquired by exercising ISOs.  In 2000, the market value for Veritas stock began to fall and continued to decline thereafter.

The proceeds petitioner received from the sale of the Veritas shares totaled $1,267,468.

B.   Federal Income Tax Returns

1. 2000 Federal Income Tax Return

Petitioner timely filed his 2000 Federal income tax return, which was prepared by a certified public accountant.  The return reported wages from Veritas of $137,261, capital gains of $425,161, miscellaneous income of $8,104, and, after itemized deductions of $88,844, taxable income of $481,682.  The return reported regular tax of $165,719 and AMT of $898,914 for a total tax liability of $1,064,611, after deducting a foreign tax credit of $22.

On June 12, 2002, relying on the advice of Brian G. Isaacson, a tax attorney, petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, amending his 2000 Federal income tax return (2000 amended return) with a Form 8275,

Disclosure Statement.[3]  The Internal Revenue Service (IRS) accepted the 2000 amended return that Mr. Isaacson prepared.

The 2000 amended return reported wages from Veritas of $563,974 rather than the $137,261 initially reported.  The increase of $426,713 in wages was attributable to sales of Veritas stock by petitioner which did not qualify for capital gain treatment and had to be included in ordinary income, a subject discussed in more detail later in this opinion. As a result, for regular tax purposes, petitioner reported $44,914 in capital gains rather than the $425,161 initially reported, miscellaneous income remained the same at $8,104, and itemized deductions were increased by $204,703 to total $293,547. The changes resulted in taxable income of $616,992.  The 2000 amended return reported regular income tax of $103,058 and AMT of $869,828, for a total tax liability of $972,864, after deducting a foreign tax credit of $22.  Petitioner's total tax liability

---

[3] Each return and amended return Mr. Isaacson prepared included a Form 8275 which contained Mr. Isaacson's tax opinion letter to petitioner.  To avoid certain penalties, Form 8275 is used by taxpayers and income tax return preparers to disclose items or positions that are not otherwise adequately disclosed on a tax return.  The form is filed to avoid the portions of the accuracy-related penalty due to disregard of rules or to a substantial understatement of income tax for non-tax-shelter items if the return position has a reasonable basis.  It can also be used for disclosures relating to preparer penalties for understatements due to unrealistic positions or disregard of rules.

was reduced from $1,064,611 to $972,864 resulting in a $91,747 refund claim.

Respondent issued the notice of deficiency in dispute on November 29, 2004. With respect to the income tax liability for 2000, the notice of deficiency increased capital gains by $87,735, reduced wages by $134,023, and denied $204,709 of itemized deductions, resulting in a determined deficiency of $183,743 together with a $36,749 section 6662 accuracy-related penalty.

### 2. 2001 Federal Income Tax Return

Mr. Isaacson prepared petitioner's 2001 Federal income tax return with an attached Form 8275 setting out his legal position. The return reported wages from Veritas of $70,939, capital gain of $698,312, miscellaneous income of $6,555, and itemized deductions of $41,625, resulting in taxable income of $734,181. The return reported regular income tax of $148,209, no alternative minimum tax, and a credit for the prior year's minimum tax of $138,957, resulting in a $9,252 tax liability.

The notice of deficiency issued on November 29, 2004, with respect to 2001 reduced the credit for the prior year's minimum tax from $138,957 to $62,730, resulting in a determined deficiency of $76,227 together with a $15,245 section 6662 accuracy-related penalty.

3. Other Amended Returns for 2000 and 2001

Petitioner attempted to file three other amended returns, two for 2000 and one for 2001 based upon advice from Mr. Isaacson. Each return was prepared by Mr. Isaacson and included Form 8275. The IRS accepted none of these additional returns. In addition, on April 15, 2003, petitioner filed a separate Form 1040X for 2000 and for 2001 with the handwritten notation "Notice of protective/incomplete claim" claiming a refund of $1 for each year and containing the following statement:

> The taxpayer's original return erroneously
> reported an amount due based on an incorrect
> valuation and/or inclusion of stock options (both
> qualified and non qualified) and the incorrect
> application of the AMT net operating loss and AMT
> credit. A list of the legal grounds supporting
> the amended return's valuation of stock options
> and/or exclusion of such options from income along
> with the correct application of the AMT net
> operating loss and AMT credit is attached to this
> form. The application of the attached legal
> arguments to the taxpayer's stock option
> transactions will result in a change in the amount
> due for lines 1, 5 through 10, and 19 through 24
> on the front of this 1040X form. The exact amount
> of the refund will be determined pending the final
> determination of facts and the release of a
> technical advice memo or court decision.

The notice of deficiency issued November 29, 2004, specifically denied the $1 refund claims for 2000 and 2001.

C. Procedural Background

On January 30, 2004, petitioner filed a complaint in the Court of Federal Claims, Spitz v. United States, No. 04-130T, requesting refunds for the years 1999, 2000, and 2001. In

response to respondent's November 29, 2004, notice of deficiency for the years at issue, petitioner timely filed a petition with the Court on March 2, 2005. On April 15, 2005, the Court of Federal Claims entered an order suspending <u>Spitz v. United States</u>, <u>supra</u>, pending the outcome of this case.

<u>Discussion</u>

A. <u>ISOs and AMT</u>

1. <u>ISOs Generally</u>

Section 421(a) provides that, if the requirements of section 422(a) are met,[4] a taxpayer does not recognize income either upon the granting[5] of an ISO to the taxpayer or when the stock is transferred[6] to the taxpayer upon exercise of an ISO. Recognition of income is deferred until the disposition of the stock.[7] Sec. 421(a); sec. 14a.422A-1, Q&A-1, Temporary Income Tax Regs, 46 Fed. Reg. 61840 (Dec. 21, 1981). Gain on the sale

---

[4] At all times from the date of granting the option until 3 months before the date of exercise, the option holder must be an employee of the company granting the option. Sec. 422(a)(2).

[5] The date on which an ISO is granted is the date on which all corporate action necessary for the grant of the ISO is completed. Sec. 1.421-7(c)(1), Income Tax Regs.

[6] For purposes of secs. 421 through 425, the term "transfer" means the transfer of ownership or substantially all rights of ownership of a share of stock to an individual pursuant to his exercise of a statutory option. Sec. 1.421-7(g), Income Tax Regs.

[7] A disposition of ISO stock generally means any sale, exchange, or gift of, or transfer of legal title to, the stock. Sec. 424(c)(1).

of the stock is characterized as capital gain if the holding
requirements under section 422(a)(1) are satisfied.  Secs. 1221
and 1222; sec. 14a.422A-1, Q&A-1, Temporary Income Tax Regs.,
supra.

In order to qualify for capital gain treatment, the
taxpayer must hold the stock he acquires by exercising an ISO for
a period ending no earlier than 2 years after the grant date or 1
year after the transfer of the stock to him.  Sec. 422(a)(1).
Selling a share of stock before the holding period expires
results in a disqualifying disposition.  Sec. 421(b).  If a
disposition is disqualified, recognized gain on the sale of the
stock is characterized as ordinary income up to the fair market
value (FMV) of the stock at the date the option is exercised, and
the balance, if any, is treated as capital gain.[8]  Sec. 421(b);
sec. 14a.422A-1, Q&A-2(a), Temporary Income Tax Regs., supra.[9]

---

[8] The gain treated as ordinary income in a disqualifying
disposition is the lesser of:  (1) The fair market value of the
stock on the date of exercise minus the option price; or (2) the
amount realized on disposition minus the option price.  Sec.
14a.422A-1, Q&A-2(a), Temporary Income Tax Regs., 46 Fed. Reg.
61840 (Dec. 21, 1981).

[9]  New regulations under sec. 422 became effective Aug. 3,
2004, but are not applicable to the years at issue.  Sec. 1.422-
5(f), Income Tax Regs.

If the amount realized on a disqualified disposition is less than the FMV at the date of exercise, the taxpayer recognizes gain only to the extent of the sale price over the option price, not the FMV over the option price at the date of exercise. Sec. 422(c)(2).

Petitioner's 2000 amended returns reported Veritas stock sales resulting in qualifying and disqualifying dispositions. The disqualifying dispositions were the result of selling shares within 1 year of transfer. Petitioner's 2001 return and amended return reported that all Veritas shares sold during the tax year were qualifying dispositions.

2.   The AMT and Its Impact on the Exercise of ISOs

For regular tax purposes, section 421 defers the recognition of income on the exercise of an ISO until the disposition of the stock. However, for AMT purposes, section 421 does not apply. Sec. 56(b)(3). Instead, the exercise of an ISO results in the recognition of income under section 83. See sec. 56(b)(3); Speltz v. Commissioner, 124 T.C. 165, 178 (2005), affd. __ F.3d __ (8th Cir. July 14, 2006); sec. 1.83-7(a), Income Tax Regs. Consequently, if the stock's FMV exceeds the option price on the date of exercise, a taxpayer recognizes ordinary income for AMT purposes in the year an ISO is exercised. Secs. 55(b)(2), 56(b)(3), 83(a); Tanner v. Commissioner, 117 T.C. 237, 242 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003).

If a taxpayer makes a disqualifying disposition in the same year the ISO is exercised and the amount realized is less than the FMV at the exercise date, the regular tax rules of section 422(c)(2) apply for AMT purposes. Thus, the amount the taxpayer includes as AMTI will not exceed the amount realized over the adjusted basis. Secs. 56(b)(3), 422(c)(2).

3. <u>The AMT and Its Impact on the Basis of ISO Stock</u>

For regular tax purposes, the taxpayer's basis in stock acquired by exercising an ISO is the exercise price. Secs. 421(a), 1012. However, for AMT purposes, a taxpayer's basis in stock acquired by exercising an ISO is the FMV of the stock at the date of exercise. Secs. 56(b)(3), 83(a), 1012. Thus, when stock is sold in a tax year subsequent to the year in which the ISO was exercised, the amount of gain (or loss) recognized for AMT purposes will vary from the amount of gain (or loss) recognized for regular tax purposes.

This anomaly may create inequitable results when a taxpayer (such as petitioner) finds himself holding stock that has decreased in value in the year after a year in which he recognized large amounts of AMT. In this situation, the AMT

imposed on the gain from exercise of the ISO results in payment of tax on income the taxpayer may never actually receive.[10]

In an attempt to avoid these harsh results petitioner asserts: (1) The capital loss limitations under sections 1211(b) and 1212(b) do not apply to the computation of AMTI; (2) he is entitled to carry back capital losses as an ATNOL to reduce his AMTI in the years at issue; and (3) he is not liable for accuracy-related penalties under section 6662 for the tax years at issue.

B.   Section 1211

Generally, losses generated by the sale or exchange of capital assets are allowed only to the extent allowed in sections 1211 and 1212. Sec. 165(f). Section 1211(b) requires a noncorporate taxpayer to first offset capital losses against capital gains. If aggregate capital losses exceed aggregate capital gains, up to $3,000 of the excess may be deducted against ordinary income. Sec. 1211(b). If a noncorporate taxpayer has capital losses exceeding the limitations of section 1211(b), the

---

[10] This became an acute problem in 2001 after the market crash of the stock of so-called dot.com companies. Many employees exercised ISOs in 1999 and 2000 at a time when the underlying stock had substantially appreciated. Also, many employees intentionally waited the 1-year holding period before selling the stock in order to recognize capital gain, as opposed to ordinary income, on the stock's appreciation for regular tax purposes. In 2001, after the stock crash, the employees found their stock's value had substantially decreased, leaving the employees with substantial AMT capital losses.

unused losses may only be carried forward to subsequent tax years, not back.  See sec. 1212(b).

Starting on November 30, 1999, and ending May 1, 2001, petitioner exercised Veritas stock options and recognized large amounts of ordinary income for AMT purposes.  However, market values fell, and petitioner sold, over a period extending from February 28, 2000, through December 27, 2002, all of the Veritas stock he had acquired by exercising the ISOs.  Petitioner sold most of the shares at prices below FMV at the date of exercise. As a result, petitioner recognized large AMT capital losses with minimal AMT capital gains.[11]  Petitioner contends that the capital loss limitations of sections 1211(b) and 1212(b) do not apply to AMT capital losses for purposes of calculating AMTI.

In general, all the Code provisions that apply in computing regular taxable income also apply when determining a taxpayer's AMTI, except as otherwise provided by statute, regulation, or other publication issued by the Commissioner.  Loomis v. Commissioner, T.C. Memo. 1997-381; sec. 1.55-1(a), Income Tax Regs.  Section 55 is unambiguous.  The computation of AMTI requires a taxpayer to first compute his regular taxable income and then adjust that amount to reflect the items described in

---

[11] To avoid confusion between petitioner's capital losses, the Court refers to his capital loss for regular tax purposes as his "regular capital loss" and refers to his capital loss for AMT purposes as his "AMT capital loss".

sections 56, 57, and 58. <u>Allen v. Commissioner</u>, 118 T.C. 1, 10, 20-21 (2002).

There are no provisions within sections 55 through 58 and the accompanying regulations excluding capital loss limitations under sections 1211(b) and 1212(b) from the calculation of an individual's AMTI. To the contrary, as explained by the Joint Committee on Taxation:

> For most purposes, the tax base for the new alternative minimum tax is determined as though the alternative minimum tax were a separate and independent income tax system.
>
> In certain instances, the operation of the alternative minimum tax as a separate and independent tax system is set forth expressly in the Code. * * *
>
> In other instances, however, where no such express statement is made, Congress did not intend to imply that similar adjustments were not necessary. Thus, for example, for [alternative] minimum tax purposes it was intended that section 1211 (limiting capital losses) be computed using [alternative] minimum tax basis * * * . [Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 438 (J. Comm. Print 1987).]

Therefore, the capital loss limitations of sections 1211(b) and 1212(b) apply in calculating a taxpayer's AMTI, and petitioner may not carry back the excess AMT capital losses recognized in

2001 and 2002 to reduce his AMTI in 1999, 2000, and 2001.[12]  See Merlo v. Commissioner, 126 T.C. 205, 212 (2006).

C.   ATNOL

Petitioner asserts he is entitled to an ATNOL deduction for AMT capital losses recognized in 2001 and 2002 and he is entitled to carry back the losses to reduce his AMTI.

Generally, a taxpayer may carry back a net operating loss (NOL) back to the 2 taxable years preceding the loss, then forward to each of the 20 taxable years following the loss.[13] Sec. 172(b)(1)(A).  Section 172(c) defines an NOL as "the excess of the deductions allowed by this chapter over the gross income", as modified by section 172(d).  In the case of a noncorporate taxpayer, the amount deductible on account of capital losses cannot exceed the amount includable on account of capital gains. Sec. 172(d)(2)(A); Erfurth v. Commissioner, 77 T.C. 570, 576

---

[12] Petitioner argues that because the instructions to line 9 of Form 6251, Alternative Minimum Tax--Individuals, for 2000 do not mention sec. 1211, the instructions indicate that sec. 1211 does not apply for purposes of calculating his AMTI.  We do not need to consider whether petitioner's interpretation of the instructions is correct.  It is settled law that taxpayers cannot rely on informal IRS instructions to justify a reporting position that is otherwise inconsistent with the controlling statutory provisions.  Johnson v. Commissioner, 620 F.2d 153, 155 (7th Cir. 1980), affg. T.C. Memo. 1978-426; Graham v. Commissioner, T.C. Memo. 1995-114; Jones v. Commissioner, T.C. Memo. 1993-358.

[13] In the case of NOLs incurred in 2001 or 2002, sec. 172(b)(1)(H) creates a 5-year carryback.  Petitioner argues that he is entitled to relief from the 5-year carryback.  However, because we conclude infra that petitioner is not entitled to an ATNOL, petitioner's argument is moot.

(1981); sec. 1.172-3(a)(2), Income Tax Regs.  As a result, excess capital losses are not subject to section 172 and are excluded when computing an NOL under section 172(c).

For AMT purposes, the ATNOL deduction is applied in lieu of section 172 in determining AMTI.  Sec. 56(a)(4).  An ATNOL deduction is defined as "the net operating loss deduction allowable for the taxable year under section 172," subject to exceptions under section 56(d).  Sec. 56(d).  Thus, an ATNOL is computed under section 172 and then adjusted pursuant to section 56(d)(2).  Sec. 56(d)(1)(B)(i).  There is no exception under section 56(d) that modifies section 172(c) or (d) to allow excess capital losses to be used as deductions under section 172(c), or to allow excess capital losses to be carried forward or back under section 172(b).  See Merlo v. Commissioner, supra at 212-213.  Instead, remaining capital losses are governed by a separate carryover scheme prescribed in section 1212(b), as described above.

Therefore, the Court finds petitioner's excess AMT capital losses are excluded for purposes of calculating his ATNOL deduction.  As a result, petitioner cannot carry back his AMT capital losses realized in 2001 and 2002 under sections 56 and 172(b).

D.  Petitioner's Other Arguments

Petitioner raises various other arguments in an attempt to deduct AMT capital losses recognized in 2001 and carry back excess AMT capital losses to reduce his 1999 and 2000 AMTI. Petitioner's additional arguments can be grouped into three categories:  (1) Arguments premised on misinterpretations and misapplications of the Code sections outlined above; (2) arguments based on congressional intent; and (3) arguments based on equity and public policy.

As outlined above, the applicable Code sections limit petitioner's use of capital losses in the year they are recognized and do not allow petitioner to carry back his AMT capital loss.  Therefore, arguments misinterpreting and misapplying those sections will not be addressed individually.

Petitioner asserts that "the intent of Congress in imposing an AMT tax on deferral preferences [including ISOs] was to accelerate the taxation of economic income without creating an additional tax liability."  Thus, petitioner argues the only way to comply with congressional intent is to allow him to carry back his AMT capital loss.  Throughout his opening brief and reply brief, petitioner focuses heavily on his interpretation of congressional intent to support these arguments.

Specifically, petitioner repeatedly references the Senate report to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat.

2085, as authority for the asserted congressional intent.  See S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1.  Petitioner does not offer a specific citation but instead cites the Senate report generally.  The Senate report addresses the AMT provisions on pages 515-540.  Id. at 515-540, 1986-3 C.B. (Vol. 3) at 515-540. The Senate report does not directly support petitioner's interpretation of congressional intent, and the Court finds no language supporting an inference of such intent.  See id. Therefore, this Court will not further consider petitioner's arguments based upon his interpretation of congressional intent.

Petitioner also advances several "policy and legal considerations".  Essentially, petitioner is arguing, under principles of equity, he should be allowed to fully deduct his AMT capital losses against AMT ordinary income and carry back excess AMT capital losses to reduce his AMTI in the years at issue.  Petitioner feels that applying the capital loss limitations of sections 1211 and 1212 to the calculation of his AMTI results in harsh and unfair tax consequences.

This Court has previously stated:

> The unfortunate consequences of the AMT in various circumstances have been litigated since shortly after the adoption of the AMT.  In many different contexts, literal application of the AMT has led to a perceived hardship, but challenges based on equity have been uniformly rejected. * * *
>
> * * * "it is not a feasible judicial undertaking to achieve global equity in taxation

> * * *. And if it were a feasible judicial
> undertaking, it still would not be a proper one,
> equity in taxation being a political rather than a
> jural concept." * * * the solution must be with
> Congress.

Speltz v. Commissioner, 124 T.C. at 176 (quoting Kenseth v.

Commissioner, 259 F.3d 881, 885 (7th Cir. 2001), affg. 114 T.C.

399 (2000)); Okin v. Commissioner, 808 F.2d 1338 (9th Cir. 1987),

affg. T.C. Memo. 1985-199. Petitioner's equity and public policy

arguments offer no relief from the tax consequences of the AMT,

as outlined above.

E.  Section 6662

Section 6662(a) imposes a 20-percent accuracy-related

penalty on the portion of any underpayment attributable to a

substantial understatement of income tax. An understatement is

the amount of the tax required to be shown on the return for the

tax year less the amount of the tax actually shown on the return,

reduced by any rebates. Sec. 6662(d)(2). An understatement is

substantial if it exceeds the greater of: (1) 10 percent of the

tax required to be shown on the return; or (2) $5,000. Sec.

6662(d)(1). Section 7491(c) provides that Commissioner bears the

burden of production with respect to accuracy-related penalties.

See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

The amount of tax required to be shown on petitioner's

return for the taxable year 2000 is $1,148,229. Petitioner

reported a tax liability of $972,864, understating his liability

by $175,365. The understatement exceeds $5,000 as well as 10 percent ($114,823) of the amount required to be shown on the return. The amount of tax required to be shown on petitioner's return for the taxable year 2001 is $85,479. Petitioner reported a tax liability of $9,252, understating his liability by $76,227. The understatement exceeds $5,000 as well as 10 percent ($8,548) of the amount required to be shown on the return. Respondent met his burden of production under section 7491(c).

However, the accuracy-related penalty is not imposed upon any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). Reliance on the advice of a tax professional may constitute reasonable cause and good faith if, under all the facts and circumstances, the reliance is reasonable and the taxpayer acted in good faith. Id.; see Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000), affd. 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(c)(1), Income Tax Regs.

For a taxpayer to reasonably rely on the advice of a professional, the taxpayer must prove by a preponderance of the evidence that: (1) The adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's

judgment.  Neonatology Associates, P.A. v. Commissioner, supra at 98-99.

Petitioner asserts a reliance defense as the basis for relief from liability under section 6662(a).  Petitioner hired Mr. Isaacson, an attorney with an LL.M. in taxation who specializes in Federal tax law, and provided him with all the necessary and accurate information with respect to all items reported on his returns.  Using the information provided, Mr. Isaacson prepared a tax opinion letter which represented to petitioner there was a reasonable legal basis to fully deduct and carry back AMT losses for the years at issue.  Relying in good faith upon this advice, petitioner hired Mr. Isaacson to prepare his 2000 amended return, which respondent accepted; subsequent 2000 amended returns; 2001 return; and subsequent 2001 amended return.

The deficiencies at issue were determined from the positions reported in the returns Mr. Isaacson prepared on behalf of petitioner.  Petitioner is unsophisticated in Federal tax law. For the foregoing reasons, the Court concludes petitioner reasonably and in good faith relied on the advice of a competent professional and holds petitioner is not liable for the section 6662(a) penalties.

In reaching these holdings, the Court has considered all arguments made and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.