127 T.C. No. 3

UNITED STATES TAX COURT

NIELD AND LINDA MONTGOMERY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 633-05.                    Filed August 28, 2006.

P-H, president and CEO of MGC Communications, Inc.
(MGC), received incentive stock options (ISOs) from MGC
between April 1996 and March 1999.  In November 1999,
P-H resigned as president and CEO of MGC and entered
into an employment contract with MGC which included
provisions accelerating the vesting dates of his ISOs.
In early 2000, P-H exercised many of his ISOs.  P-H
subsequently sold shares of MGC stock in 2000 and 2001
at prices above and below the exercise prices that he
paid for the shares.

Ps filed a joint Federal income tax return for
2000 reporting total tax of $2,831,360, including
alternative minimum tax (AMT).  Ps subsequently
submitted to R an amended return for 2000 in which they
claimed (1) they were not subject to AMT, and (2) they
overpaid their taxes.  R rejected Ps' claimed
overpayment and issued to Ps a notice of deficiency for
2000.  R determined Ps failed to report wages, capital

gains, and additional alternative minimum taxable income (AMTI) arising from the exercise of P-H's ISOs.

Held: P-H's rights to the MGC shares he acquired upon the exercise of his ISOs were not subject to a substantial risk of forfeiture within the meaning of sec. 83, I.R.C., and sec. 16(b) of the Securities Exchange Act of 1934. Held, further: R's determinations Ps failed to report wages, capital gains, and AMTI arising from the exercise of P-H's ISOs are sustained in that (1) R properly applied the $100,000 annual limit imposed on ISOs under sec. 422(d), I.R.C., (2) Ps are not entitled to carry back capital losses to 2000, and (3) Ps are not entitled to carry back alternative tax net operating losses to 2000. Held, further: Ps are not liable for an accuracy-related penalty for 2000 under sec. 6662(b)(2), I.R.C.

Duncan C. Turner and Brian G. Isaacson, for petitioners.

Kirk M. Paxson, Julie L. Payne, and William C. Schmidt, for respondent.

HAINES, Judge: Respondent determined a deficiency of $417,601 in petitioners' Federal income tax for 2000 and an accuracy-related penalty of $83,520 under section 6662(b).[1] All references to petitioner in the singular are to petitioner Nield Montgomery.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[2] the issues remaining for decision are:

1. Whether petitioner's rights in shares of stock acquired upon the exercise of incentive stock options (ISOs) in 2000 were subject to a substantial risk of forfeiture within the meaning of section 83(c)(3) and section 16(b) of the Securities Exchange Act of 1934[3] (the Exchange Act). We hold petitioner's rights were not subject to a substantial risk of forfeiture.

2. Whether respondent properly determined that petitioner's options exceeded the $100,000 annual limit imposed on ISOs under section 422(d). We hold respondent correctly applied section 422(d) in this case.

3. Whether petitioners may carry back capital losses to reduce the amount of their alternative minimum taxable income for 2000. We hold they may not.

4. Whether petitioners may carry back alternative tax net operating losses to reduce the amount of their alternative minimum taxable income for 2000. We hold they may not.

5. Whether petitioners are liable for an accuracy-related penalty under section 6662(b)(2) for 2000. We hold petitioners

---

[2] The parties filed a stipulation of settled issues in which they agreed to the amounts of deductions petitioners are entitled to claim for charitable contributions made during 2000.

[3] The Securities Exchange Act of 1934, ch. 404, sec. 16(b), 48 Stat. 896, codified at 15 U.S.C. sec. 78p(b) (2000). For convenience, all citations are to sections of the Securities Exchange Act of 1934.

are not liable for the accuracy-related penalty under section 6662(b).

## FINDINGS OF FACT

Some facts have been stipulated and are so found. The parties' stipulations of facts, with attached exhibits, are incorporated herein by this reference. At the time the petition was filed, petitioners (husband and wife) resided in Las Vegas, Nevada.

A.  MGC Communications, Inc.

In 1995, petitioner cofounded NevTEL, Inc., subsequently renamed MGC Communications Inc. (MGC),[4] to engage in the business of providing local telephone service in Nevada. Petitioner served as MGC's president and chief executive officer from 1995 to November 1999. During the period in question, MGC's common stock was publicly traded on the NASDAQ market system, and MGC was subject to the reporting requirements of the Exchange Act.

MGC shares were subject to a 6-for-10 reverse stock split in May 1998 and a 3-for-2 stock split in August 2000. Unless otherwise indicated, all data (including tables) set forth below reflect these stock splits.

1.  MGC Communications, Inc. Stock Option Plan

In 1996, MGC adopted the MGC Communications, Inc. Stock

---

[4] Although MGC Communications, Inc., was subsequently renamed Mpower Communications, Inc., we shall refer to the corporation as MGC.

Option Plan (the MGC stock option plan) which provided in pertinent part: (1) The plan would be administered by a committee of no fewer than two "disinterested persons" (the committee), who would be appointed by MGC's board of directors (MGC board) from its membership or, in the absence of such appointments, by the entire MGC board; (2) the committee would have the sole discretion to (a) select the persons to be granted options, (b) determine the number of shares subject to each option, (c) determine the duration of the exercise period for any option, (d) determine that options may only be exercised in installments, and (e) impose other terms and conditions on each option as the committee in its sole discretion deemed advisable. The MGC stock option plan expressly contemplated that the committee would grant to MGC employees ISOs within the meaning of sections 421 and 422.

### 2. Petitioner's Incentive Stock Options

On April 1, 1996, September 4, 1998, and March 1, 1999, petitioner executed a series of share option agreements under which he was granted ISOs from MGC. Each of the share option agreements stated that if petitioner were considered an "insider" subject to section 16(b) of the Exchange Act, petitioner "shall be restricted from selling any Option Shares acquired by him through exercise of the Options or any portion thereof during the six (6) month period following the date of grant of the Option."

Table 1 sets forth the dates on which petitioner's ISOs were granted and the number of MGC shares petitioner was entitled to purchase under each ISO.

Table 1

| Grant | Grant date | Shares |
|-------|-----------|--------|
| 1 | 4/1/96 | 540,000 |
| 2 | 9/4/98 | 22,500 |
| 3 | 9/4/98 | 45,000 |
| 4 | 3/1/99 | 15,000 |
| 5 | 3/1/99 | 22,500 |

Petitioner's ISOs provided for exercise prices, i.e., the price petitioner would pay for each MGC share, ranging from $0.55 to $5.33. Petitioner's ISOs originally were scheduled to vest on various dates between 1997 and 2003.

Petitioner was not granted any additional MGC stock options after March 1, 1999. During the period in question, petitioners owned less than 10 percent of the total combined voting power of all classes of MGC's stock.

Petitioner unilaterally determined the specific terms and conditions of the ISOs that he received under the share option agreements. The MGC board did not appoint a committee to administer the MGC stock option plan, and the MGC board did not play any role in consummating the share option agreements described above.

B. Petitioner's 1999 Employment Agreement With MGC

On November 1, 1999, petitioner entered into a comprehensive

agreement with MGC governing his employment status with MGC and his ISOs (the 1999 employment agreement). Pursuant to the 1999 employment agreement: (1) Petitioner resigned as president, chief executive officer, and director of MGC, and he resigned as an officer and director of MGC's subsidiaries; (2) petitioner agreed to assist MGC's new chief executive officer "in order to provide for a smooth transition for the Company"; (3) MGC agreed to make a lump-sum payment of $360,000 to petitioner; (4) MGC and petitioner agreed to accelerate the vesting dates of petitioner's ISOs; and (5) petitioner and MGC agreed that petitioner would continue to be employed by MGC through April 1, 2001, for the purpose of providing advice regarding regulatory developments, testimony at legal, regulatory, and administrative proceedings as necessary, and other mutually agreed duties.

After November 1, 1999, MGC never requested petitioner to prepare any formal reports for the company, and petitioner did not prepare any formal reports for MGC.

Table 2 sets forth (1) the fair market value of MGC shares as of the dates petitioner's ISOs were granted, and (2) the total fair market value of all shares as to which petitioner's ISOs were exercisable for the first time during each of the years 1997 to 2001 (taking into account the accelerated vesting schedule that MGC and petitioner agreed to on November 1, 1999):

Table 2

| Year ISO first exercisable | FMV of MGC shares as of ISO grant date | | | | | Total FMV |
|---|---|---|---|---|---|---|
| | Grant 1 | Grant 2 | Grant 3 | Grant 4 | Grant 5 | |
| 1997 | $60,000 | -- | -- | -- | -- | $ 60,000 |
| 1998 | 60,000 | -- | -- | -- | -- | 60,000 |
| 1999 | 60,000 | $96,000 | $240,000 | $20,298 | -- | 416,298 |
| 2000 | 60,000 | 24,000 | -- | 20,298 | $91,350 | 195,648 |
| 2001 | 60,000 | -- | -- | 20,304 | -- | 80,304 |

C. Petitioner's SEC Filings

In February 2000, petitioner filed with the Securities and Exchange Commission (SEC) a Form 5, Annual Statement Of Changes In Beneficial Ownership of Securities, in which he reported owning 736,500 shares of MGC common stock and options to purchase 430,000 additional shares of MGC common stock.[5] A cover letter accompanying petitioner's Form 5 stated that the report would be petitioner's last because he was no longer subject to the reporting requirements of section 16(a) of the Exchange Act. Petitioner did not file any further Forms 5 with the SEC.

During 2000 and 2001, petitioner remained in contact with certain MGC executive officers and was privy to material, non-public information regarding MGC's operations and financial matters.

D. Petitioner's Acquisitions and Dispositions of MGC Shares

Table 3 sets forth the ISOs that petitioner exercised,

---

[5] Adjusted for MGC's August 2000 stock split, petitioner held options to purchase 645,000 shares of MGC common stock. See supra Table 1.

identified by grant, exercise date, numbers of MGC shares acquired, total exercise price, and total fair market value (FMV) of the MGC shares acquired as of each exercise date:

Table 3

| Grant | Exercise date | Shares acquired | Exercise price | FMV |
|-------|---------------|-----------------|----------------|-----|
| 1 | 1/11/00 | 324,000 | $179,982 | $10,773,000 |
| 2 | 1/11/00 | 18,000 | 96,000 | 598,500 |
| 3 | 1/11/00 | 45,000 | 240,000 | 1,496,250 |
| 4 | 1/11/00 | 5,000 | 20,300 | 166,250 |
| 4 | 3/9/00 | 5,000 | 20,300 | 237,050 |
| 5 | 3/9/00 | 22,500 | 91,350 | 1,066,725 |
| 1 | 3/29/00 | 108,000 | 59,994 | 4,733,640 |

Petitioner subsequently disposed of a number of the MGC shares he had acquired upon the exercise of his ISOs (as described in Table 3 above). In particular, on May 4, 2000, petitioner transferred 2,250 shares of MGC stock by way of a gift. In addition, petitioner sold a number of MGC shares during 2000 and 2001, as set forth in the following table:

Table 4

| Grant | Sale date | Shares sold | Sale proceeds | Gain or loss (Difference between exercise price and sales proceeds) |
|-------|-----------|-------------|---------------|--------------------------------------------------------------------|
| 1 | 9/29/00 | 175,000 | $1,480,729 | $1,383,517 |
| 1 | 12/8/00 | 50,000 | 209,991 | 182,216 |
| 1 | 12/20/00 | 42,000 | 140,121 | 116,790 |
| 1 | 12/20/00 | 13,000 | 43,371 | 36,149 |
| 1 | 12/21/00 | 41,750 | 151,486 | 128,294 |
| 2 | 12/21/00 | 9,750 | 35,377 | (16,623) |
| 2 | 12/21/00 | 8,250 | 29,934 | (14,066) |
| 3 | 12/21/00 | 10,250 | 37,191 | (17,475) |
| 3 | 12/28/00 | 6,000 | 28,947 | (3,053) |
| 3 | 12/29/00 | 19,000 | 82,196 | (93,037) |
| 3 | 3/13/01 | 5,000 | 19,122 | (7,544) |

| | | | | |
|---|---|---|---|---|
| 3 | 3/14/01 | 4,740 | 18,297 | (7,036) |
| 4 | 3/14/01 | 250 | 963 | (52) |
| 4 | 3/15/01 | 4,750 | 18,215 | (1,070) |
| 4 | 3/15/01 | 998 | 3,827 | (225) |
| 4 | 3/15/01 | 4,002 | 15,346 | (902) |
| 5 | 3/14/01 | 250 | 963 | (52) |
| 5 | 3/16/01 | 10,000 | 39,496 | (1,104) |
| 5 | 3/19/01 | 5,000 | 19,278 | (1,022) |
| 5 | 3/20/01 | 7,500 | 27,275 | (2,160) |

Petitioners have never been in the trade or business of trading stocks. Petitioners held their MGC shares for investment purposes and not as traders or dealers.

MGC never requested that petitioner disgorge any profits from his sales of MGC shares, petitioner was never sued by MGC or one of its shareholders pursuant to section 16(b) of the Exchange Act, and petitioner never paid over to MGC any part of the proceeds from his sales of MGC common stock.

E.  Petitioners' Tax Return and Amended Return

On or about October 18, 2001, petitioners filed a joint Federal income tax return for the taxable year 2000 reporting total tax of $2,831,360 (including AMT described below). Petitioners reported total payments of $2,636,723, leaving a balance due of $196,006 (including an estimated tax penalty of $1,369). Petitioners submitted Form 6251, Alternative Minimum Tax--Individuals, with their tax return for 2000. On Form 6251, line 10, petitioners reported $3,988,180 of alternative minimum tax income (arising from the exercise of petitioner's ISOs) in excess of regular taxable income, a total of $10,665,935 of

alternative minimum taxable income (AMTI), and AMT of $526,679. Petitioners' tax return was prepared and signed by a tax return preparer employed at Deloitte & Touche LLP.

Petitioners failed to remit the full amount of tax due with their tax return. Respondent accepted petitioners' tax return as filed and assessed the tax reported therein, as well as statutory interest and a late-payment penalty.

Respondent issued to petitioners a Final Notice of Intent to Levy and Notice of Your Right to a Hearing with regard to their unpaid taxes for 2000. Petitioners submitted to respondent an amended return for 2000 and a request for an administrative hearing under section 6330. In their amended return, petitioners claimed that they overstated the amount of tax due on their original return, and they claimed they were due a refund of $519,087. Contrary to their original return, petitioners submitted a Form 6251 with their amended return in which they reported $850,534 of alternative minimum taxable income in excess of regular taxable income, a total of $7,148,666 of AMTI, and zero AMT.

Respondent declined to consider petitioners' refund claim and issued to petitioners a Notice of Determination Concerning Collections Actions for 2000. Petitioners filed a petition for lien or levy action with the Court at docket No. 16864-02L. Upon review of the matter, the Court remanded the collection case to

respondent's Office of Appeals for consideration of petitioners' amended return.  During the remand, respondent audited petitioners' original and amended returns and issued to petitioners a Supplemental Notice of Determination under section 6330 and a notice of deficiency under section 6213(a).[6]

In the notice of deficiency, respondent determined (1) petitioners failed to report the correct amount of wages and capital gains arising from the exercise of petitioner's ISOs, (2) petitioners were not entitled to certain itemized deductions, (3) petitioners were liable for AMT in excess of that reported on their original return, and (4) petitioners were liable for an accuracy-related penalty.  Specifically, respondent determined that petitioners' correct tax liability for 2000 totaled $3,248,961--a sum comprising regular tax of $2,511,949 and AMT of $737,012.  Petitioners filed a petition for redetermination in this case challenging the notice of deficiency.

At the conclusion of the trial in this case, the Court directed the parties to file seriatim briefs.  After petitioners filed their opening brief, respondent filed an answering brief and a motion for leave to file amended answer seeking an increased deficiency and an increased accuracy-related penalty to conform the pleadings to testimony offered by petitioner at

---

[6] Petitioners' collection review case at docket No. 16864-02L was stayed pending the disposition of the instant case.

trial.  Respondent asserted that petitioner's trial testimony demonstrated that petitioner's options were not ISOs as defined in section 422(b).  Respondent's motion was denied by Order dated May 10, 2006.  Under the following analysis, petitioner's options are treated as ISOs (consistent with respondent's position in the notice of deficiency).

OPINION

I.    Taxation of Stock Options

A.    Incentive Stock Options

Generally, under section 421(a), a taxpayer is not required to recognize income upon the grant or exercise of an ISO.[7] Section 422(a) provides that section 421(a) shall apply with respect to the transfer of a share of stock to a taxpayer pursuant to the exercise of an ISO if (1) no disposition of such

---

[7]  Sec. 422(b) defines an incentive stock option (ISO) in pertinent part as an option granted to a taxpayer by an employer corporation (or a parent or subsidiary corporation) to purchase stock of any such corporation but only if (1) the option is granted pursuant to a plan which is approved by the stockholders of the granting corporation, (2) such option is granted within the earlier of 10 years from the date such plan is adopted or approved by the stockholders, (3) such option is not exercisable after 10 years from the date such option is granted, (4) the option price is not less than the fair market value of the stock at the time such option is granted, (5) such option is not transferrable by the taxpayer other than by will or the laws of descent and distribution and is exercisable during the taxpayer's lifetime only by the taxpayer, and (6) such taxpayer, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation.

share is made by the individual within 2 years from the date of the granting of the option nor within 1 year after the transfer of the share to the individual, and (2) the taxpayer remains an employee of the corporation granting the option (or of a parent or subsidiary corporation of such corporation) during the period beginning on the date the option was granted and ending on the day 3 months before the date the option was exercised.  Any gain or loss on a sale of shares acquired pursuant to the exercise of an ISO that are held for the periods prescribed in section 422(a)(1) generally will qualify as a capital gain or loss. Secs. 1001, 1221, 1222.

Section 421(b) provides that if a taxpayer disposes of any shares of stock acquired pursuant to the exercise of an ISO before the expiration of the holding periods prescribed in section 422(a)(1), the taxpayer shall recognize an increase in income in the taxable year in which such disqualifying disposition occurs.[8]  Section 422(c)(2) provides in pertinent part that if a taxpayer disposes of any shares of stock acquired pursuant to the exercise of an ISO before the expiration of the holding periods required in section 422(a)(1), and such disposition is a sale or exchange with respect to which a loss

---

[8]  Sec. 424(c) provides that the term "disposition" as related to shares of stock acquired pursuant to the exercise of an ISO generally means "a sale, exchange, gift, or a transfer of legal title".

(if sustained) would be recognized to such individual, the amount includable in the taxpayer's gross income shall not exceed the excess (if any) of the amount realized on such sale or exchange over the adjusted basis of such shares.

Section 422(d) imposes an annual limit on options that qualify as ISOs. Section 422(d) provides:

> SEC. 422(d). $100,000 Per Year Limitation.--
>
> (1) In general.--To the extent that the aggregate fair market value of stock with respect to which incentive stock options (determined without regard to this subsection) are exercisable for the 1st time by any individual during any calendar year (under all plans of the individual's employer corporation and its parent and subsidiary corporations) exceeds $100,000, such options shall be treated as options which are not incentive stock options.
>
> (2) Ordering rule.--Paragraph (1) shall be applied by taking options into account in the order in which they were granted.
>
> (3) Determination of fair market value.--For purposes of paragraph (1), the fair market value of any stock shall be determined as of the time the option with respect to such stock is granted.

In sum, when the aggregate fair market value of stock that a taxpayer may acquire pursuant to ISOs that are exercisable for the first time during any taxable year exceeds $100,000, such options shall be treated as nonqualified stock options (NSOs) under section 83 (as discussed in detail below).

B. <u>Alternative Minimum Tax</u>

   1. <u>In General</u>

The Internal Revenue Code imposes upon taxpayers an AMT in addition to all other taxes imposed by subtitle A. Sec. 55(a). Although a taxpayer exercising an ISO may defer recognition of income for regular tax purposes, the taxpayer nevertheless may incur AMT liability. See sec. 56(b)(3). The AMT is imposed upon the taxpayer's AMTI, which is an income base broader than that applicable for regular tax purposes. <u>Allen v. Commissioner</u>, 118 T.C. 1, 5 (2002); see also H. Conf. Rept. 99-841 (Vol. II), at II-249, II-264 (1986), 1986-3 C.B. (Vol. 4) 1, 249, 264. AMTI is defined as the taxable income of a taxpayer for the taxable year, determined with adjustments provided in sections 56 and 58, and increased by the amount of items of tax preference described in section 57. Sec. 55(b)(2).

For purposes of computing a taxpayer's AMTI, section 56(b)(3) provides that section 421 shall not apply to the transfer of stock acquired pursuant to the exercise of an ISO as defined by section 422. Therefore, under the AMT, the spread between the exercise price and the fair market value of the shares of stock on the date an ISO is exercised is treated as an item of adjustment and is included in the computation of AMTI. See sec. 56(b)(3); sec. 1.83-7(a), Income Tax Regs.; see also <u>Speltz v. Commissioner</u>, 124 T.C. 165, 178-179 (2005), affd. 454

F.3d 782 (8th Cir. 2006).  Insofar as section 56(b)(3) provides that section 421 shall not apply to the exercise of an ISO, section 83 is applicable to the exercise of an ISO inasmuch as the exclusion for ISOs set forth in section 83(e)(1) is negated.[9]

2.  Section 83

Section 83(a) provides in pertinent part that if property is transferred to a taxpayer in connection with the performance of services (i.e., stock transferred to a taxpayer upon the exercise of a stock option), the excess of the fair market value of the stock (measured as of the first time the taxpayer's rights in the stock are not subject to a substantial risk of forfeiture) over the amount, if any, paid for the stock (the exercise price) shall be included in the taxpayer's gross income in the first taxable year in which the taxpayer's rights in the stock are not subject to a substantial risk of forfeiture.  See Tanner v. Commissioner, 117 T.C. 237, 242 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003); sec. 1.83-7(a), Income Tax Regs.  As mentioned above, the combined application of various provisions of sections 55, 56, and 83, requires that, upon the exercise of an ISO, such income be included in the computation of AMTI.

---

[9] Sec. 56(b)(3) further provides, however, that sec. 422(c)(2) shall apply "in any case where the disposition and the inclusion for * * * this part are within the same taxable year and such section shall not apply in any other case."

Section 83(c) contains special rules related to recognition of income under section 83(a).  Section 83(c)(3) provides that a taxpayer's rights in property (stock) are subject to a substantial risk of forfeiture and are not transferable so long as the sale of the stock at a profit could subject the taxpayer to suit under section 16(b) of the Exchange Act.

3.  <u>AMT Impact on Basis</u>

As a result of the unique treatment of the exercise of ISOs under the AMT regime, a taxpayer normally will have two different bases in the same shares of stock.  The taxpayer's regular tax basis is the exercise price or cost basis.  See sec. 1012. However, for AMT purposes, section 56(b)(3) provides that the adjusted basis of any stock acquired by the exercise of an ISO "shall be determined on the basis of the treatment prescribed by this paragraph."  In other words, a taxpayer's adjusted AMT basis equals the exercise or cost basis in the shares increased by the amount of income included in AMTI.  See secs. 55(b)(2), 56(b)(3), 83(a).

The following example illustrates the general operation of the ISO basis rules.  Assume a taxpayer is granted an ISO giving him the right to purchase 100 shares of ABC, Inc., common stock at $1 per share.  The taxpayer exercises the ISO at a time when ABC, Inc. common stock is trading at $10 per share and the taxpayer's rights in such shares are freely transferrable.  Under

this example, the taxpayer's basis for regular tax purposes is $100--the total exercise price or cost incurred by the taxpayer to purchase the 100 shares of stock. On the other hand, the taxpayer's adjusted basis solely for AMT purposes is $1,000--an amount that comprises the taxpayer's $100 cost basis plus the $900 bargain purchase element of the transaction that is included in the computation of the taxpayer's AMT liability.

The anomaly in the ISO basis rules may create inequitable results when a taxpayer has incurred AMT liability upon the exercise of an ISO in one taxable year, only to have the shares of stock decrease in value the following year. In this situation, the AMT imposed on the bargain purchase element of the ISO results in a payment of tax on income the taxpayer may never actually receive.

II. The Parties' Positions

A. Respondent's Determinations

Respondent determined that the aggregate fair market value of the stock with respect to which petitioner held ISOs that were first exercisable in 1999 and 2000 exceeded the $100,000 limitation imposed under section 422(d). In connection with this determination, respondent asserts that the aggregate value of stock that a taxpayer may acquire pursuant to ISOs during a taxable year is computed for purposes of the $100,000 limitation of section 422(d) without taking into account any disqualifying

dispositions; i.e., transfers or sales of stock prior to the expiration of the holding periods required under section 422(a)(1). Taking into account the effects of section 422(d) and petitioner's disqualifying dispositions of MGC shares, respondent determined that petitioners failed to report gross income (wages and capital gains) subject to regular tax, and they failed to compute properly their AMT for 2000.

B. Petitioners' Contentions

Petitioners first contend they were not obliged to recognize any income related to the shares of stock petitioner acquired upon the exercise of his ISOs during the taxable year 2000 because petitioner's rights in the MGC shares in question were subject to a substantial risk of forfeiture during 2000. Specifically, petitioner maintains he was a statutory insider of MGC throughout 2000, and he could have been sued by MGC or another MGC shareholder under section 16(b) of the Exchange Act and forced to disgorge the profits he realized when he sold his MGC shares. See sec. 83(c)(3).

In the alternative, petitioners assert they incurred capital losses or alternative tax net operating losses (ATNOLs) in years subsequent to the taxable year 2000, and such losses may be carried back to reduce their AMTI for 2000. Petitioners contend that for AMT purposes (1) capital losses are not subject to the $3,000 limitation imposed under section 1211, and (2)

imposing a $3,000 limitation on the amount of capital losses petitioners may report would defeat Congress's intent to tax only the economic gain received by a taxpayer.

III.  Whether Petitioner's Rights in his MGC Shares Were Subject to a Substantial Risk of Forfeiture Within the Meaning of Section 83(c)(3)

Section 16(a) of the Exchange Act requires the principal stock holders of any class of equity security registered under section 12 of the Exchange Act, and the directors and officers of the issuer of such securities (hereinafter insiders), to file periodic statements with the SEC disclosing the amount of equity securities such insider owns, and purchases and sales made by such insider, during the reporting period.  Section 16(b) of the Exchange Act provides in pertinent part:

> (b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.

The remainder of section 16(b) provides that an issuer or any shareholder of the issuer may bring suit against an insider to recover any profit realized by the insider on any purchase and sale, or any sale and purchase, of any equity security of such issuer within any period of less than 6 months.

Section 16(b), the so-called short-swing profit recovery provision, is a prophylactic and strict liability measure "under which an insider's short-swing profits can be recovered regardless of whether the insider actually was in possession of material, non-public information."  Ownership Reports and Trading By Officers, Directors and Principal Security Holders (Ownership Reports), Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7243 (Feb. 21, 1991); see Levy v. Sterling Holding Co., LLC, 314 F.3d 106, 109-111 (3d Cir. 2002); Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320 (2d Cir. 1998).  Section 16(b) applies to transactions involving derivative securities such as stock options.  At Home Corp. v. Cox Commcns. Inc., 446 F.3d 403 (2d Cir. 2006); Magma Power Co. v. Dow Chem. Co., supra at 321; SEC rule 16a-1(c) and (d), 17 C.F.R. sec. 240.16a-1(c) and (d) (2006).

The elements of a claim under section 16(b) of the Exchange Act are "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities

(4) within a six-month period." Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998).

The parties disagree whether petitioner was an insider subject to liability under section 16(b) of the Exchange Act during 2000. Respondent points out that, after petitioner's resignation as an officer and director of MGC in 1999, petitioner no longer filed Form 4, Statement of Changes in Beneficial Ownership, or Form 5, Statement of Changes in Beneficial Ownership of Securities, with the SEC, he was not a 10-percent shareholder, and he apparently no longer considered himself an insider subject to the reporting requirements of section 16(a) of the Exchange Act. Respondent also points out that no lawsuit was ever filed against petitioner seeking disgorgement of the profits he realized when he sold MGC shares during 2000 and 2001. Petitioner counters that he remained an insider at MGC during 2000 and 2001 as an adviser to MGC's executives. Although we are doubtful petitioner was an insider subject to liability under section 16(b) of the Exchange Act during 2000, we need not decide the point. Assuming arguendo that petitioner was an insider within the meaning of section 16(b) of the Exchange Act, we conclude that petitioner was not subject to a substantial risk of forfeiture during the taxable year 2000 because he exercised his ISOs and acquired shares of MGC stock at a point in time outside

of the 6-month period which would give rise to a lawsuit under section 16(b) of the Exchange Act.

It is well settled that it is the acquisition (grant) of a stock option (as opposed to the exercise of a stock option) that is deemed to be a purchase of a security for purposes of the 6-month short-swing profit recovery provision under section 16(b) of the Exchange Act.[10] See Magma Power Co. v. Dow Chem. Co., supra at 321-322. The SEC made this point indelibly clear when it adopted the regulatory framework governing insider transactions involving derivative securities in 1991. The SEC stated in pertinent part:

> The functional equivalence of derivative securities and their underlying equity securities for section 16 purposes requires that the acquisition of the derivative security be deemed the significant event, not the exercise. * * * The Rules correspondingly recognize that, for purposes of the abuses addressed by section 16, the exercise of a derivative security, much like the conversion of a convertible security, essentially changes the form of beneficial ownership from indirect to direct. Since the exercise represents neither the acquisition nor the disposition of a right

_____

[10] For the sake of completeness, we observe the exercise of a stock option is treated as a purchase of the underlying security for purposes of the insider reporting provisions under section 16(a) of the Exchange Act. SEC rule 16a-1(b), 17 C.F.R. sec. 240.16a-1(b) (2006) defines a "call equivalent position" as "a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option position." SEC rule 16a-4(b), 17 C.F.R. sec. 240.16a-4(b) (2006), provides that the exercise of a call equivalent position shall be reported on Form 4 and treated for reporting purposes as (1) a purchase of the underlying security and (2) a closing of the derivative security position.

> affording the opportunity to profit, it should not be an event that is matched against another transaction in the equity securities for purposes of section 16(b) short-swing profit recovery. [Emphases added; fn. ref. omitted.]

Ownership Reports, supra, 56 Fed. Reg. at 7248-7249. The SEC went on to state that "to avoid short-swing profit recovery, a grant of an employee stock option by an issuer, absent an exemption, must occur at least six months before or after a sale of the equity security or any derivative security relating to the equity security." Id., 56 Fed. Reg. at 7251 n.120; see sec. 16(b) of the Exchange Act (last sentence authorizes the SEC to adopt rules and regulations exempting transactions as not comprehended within the purpose of the provision).

In Tanner v. Commissioner, 117 T.C. 237, 239 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003), this Court held that the 6-month period under which an insider is subject to liability under section 16(b) of the Exchange Act begins on the date that a stock option is granted. In Tanner v. Commissioner, supra, the taxpayer, an officer, director, and owner of approximately 65 percent of an issuer's stock, was granted an NSO in July 1993 to purchase up to 182,000 of the issuer's shares at an exercise price of 75 cents per share. The taxpayer exercised the NSO in September 1994, and the Commissioner determined the taxpayer was obliged to report compensation income on his return for 1994 pursuant to section 83. The taxpayer challenged the

Commissioner's determination and asserted he was not obliged to report compensation income in 1994 because he had signed a lockup agreement which purportedly extended for 2 years the period under which he would he would remain liable under section 16(b) of the Exchange Act. We rejected the taxpayer's arguments and held (1) the 6-month period under section 16(b) of the Exchange Act began to run in July 1993 when the taxpayer was granted the NSO in question, (2) the 6-month period was not extended by the 2-year lockup agreement, and (3) the 6-month period expired long before the taxpayer exercised the NSO in September 1994. Id. at 244-246.

Petitioner contends the Court's holding in Tanner v. Commissioner, supra, is not controlling in this case. Petitioner testified at trial that the MGC stock option plan was not administered by the MGC Board nor by a committee as contemplated under the plan, and he unilaterally granted the ISOs in question to himself. Consistent with these points, petitioner maintains (1) he obtained his ISOs pursuant to a "discretionary transaction" within the meaning of SEC rule 16b-3(b)(1), 17 C.F.R. sec. 240.16b-3(b)(1) (2006); (2) his ISOs were not exempt from the application of section 16(b) of the Exchange Act; and (3) because he failed to report to the SEC that he exercised the ISOs, and subsequently sold some of the shares so acquired, he

remained liable under section 16(b) of the Exchange Act until approximately June 2003.

Petitioner's reliance on the discretionary transaction provisions contained in SEC rule 16b-3 is misplaced. A discretionary transaction is defined in SEC rule 16b-3(b)(1) as a transaction pursuant to an employee benefit plan that (1) is at the volition of a plan participant; (2) is not made in connection with the participant's death, disability, retirement, or termination of employment; (3) is not required to be made available to a plan participant pursuant to the Internal Revenue Code; and (4) results in either an intraplan transfer involving an issuer equity securities fund, or a cash distribution funded by a volitional disposition of an issuer equity security. SEC rule 16b-3(f) provides that a discretionary transaction shall be exempt from section 16(b) of the Exchange Act only if an election effecting an acquisition (or disposition) is made at least 6 months following the date of the most recent disposition (or acquisition), as the case may be.

A review of the SEC's release adopting SEC rule 16b-3 reveals the exemption for discretionary transactions was targeted at opportunities for abuse arising from so-called fund-switching transactions effected within contributory employee benefit plans. In particular, the SEC stated in pertinent part:

> Many contributory employee benefit plans permit a
> participant to choose one of several funds in which to

invest (e.g., an issuer stock fund, a bond fund, or a money market fund). Plan participants typically are given the opportunity to engage in 'fund-switching' transactions, permitting the transfer of assets from one fund to another, at periodic intervals. Plan participants also commonly have the right to withdraw their investments in cash from a fund containing equity securities of the issuer. Fund-switching transactions involving an issuer equity securities fund and cash distributions from these funds may present opportunities for abuse because the investment decision is similar to that involved in a market transaction. Moreover, the plan may buy and sell issuer equity securities in the market in order to effect these transactions, so that the real party on the other side of the transaction is not the issuer but instead a market participant. [Fn. ref. omitted.]

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-37260, 61 Fed. Reg. 30376, 30379 (June 14, 1996).

Although petitioner exercised discretion in granting ISOs to himself, in exercising the ISOs, and in disposing of the underlying shares, petitioner's activities were not undertaken under the auspices of an employee benefit plan as contemplated under SEC rule 16b-3, nor did his activities result in an intrafund transfer or a cash distribution from a plan. Accordingly, we conclude the discretionary transaction provisions are not relevant to the question whether petitioner was subject to a suit under section 16(b) of the Exchange Act during 2000.

The period during which petitioner was subject to liability under section 16(b) of the Exchange Act is directly addressed in SEC rule 16b-3(d)(3) and SEC rule 16(b)-6(a) and (b), 17 C.F.R.

sec. 240.16b-6(a) and (b) (2006), which apply specifically to derivative securities. Read together, these regulations provide that (1) the establishment of a call equivalent position (grant of a stock option) shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Exchange Act, (2) the acquisition of underlying securities at a fixed price upon the exercise of a call equivalent position shall be exempt from the operation of section 16(b) of the Exchange Act, and (3) if 6 months elapse between the acquisition of a derivative security and the disposition of the derivative security or its underlying equity security, the transaction is exempt from the operation of section 16(b) of the Exchange Act. Inasmuch as petitioner did not sell any MGC shares within 6 months of March 1999--the last date MGC granted petitioner an ISO--we conclude petitioner qualified for the exemption set forth in SEC rule 16b-3(d)(3). Consequently, we hold petitioner was not subject to a suit under section 16(b) of the Exchange Act during 2000.

We would reach the same conclusion even if some technical impediment precluded petitioner's ISOs from qualifying for exemption under SEC rule 16b. That rule merely provides exemptions or a "safe-harbor" from the applicability of section 16(b) of the Exchange Act--it does not impose affirmative liability. As previously discussed, because petitioner's ISOs were granted between April 1996 and March 1999, the 6-month

period during which petitioner would have been subject to suit under section 16(b) of the Exchange Act expired in September 1999, several months before petitioner exercised his ISOs in 2000. Petitioner simply has not persuaded us that his liability under section 16(b) of the Exchange Act extended beyond September 1999. Because petitioner was not subject to a suit under section 16(b) of the Exchange Act during 2000, we conclude petitioner's rights in his MGC shares were not subject to a substantial risk of forfeiture within the meaning of section 83(c).[11]

IV. Whether Respondent Correctly Applied the $100,000 Annual Limit on ISOs Imposed Under Section 422(d)

Section 422(d) provides stock options will be subject to taxation as NSOs under section 83 if the aggregate fair market value of stock a taxpayer may acquire pursuant to ISOs that are exercisable for the first time during any taxable year exceeds $100,000. Section 421(b) provides that if the transfer of a share of stock to a taxpayer pursuant to the exercise of an option would otherwise meet the requirements of section 422(a), except there is a failure to meet a holding period requirement,

---

[11] Petitioner contends sec. 1.83-3(j)(1), Income Tax Regs., is invalid insofar as the regulation fails to acknowledge that the period during which an insider may remain subject to suit under sec. 16(b) of the Exchange Act may extend beyond the normal 6-month period specified in that provision. Because we have rejected petitioner's argument that the period he was subject to a suit under sec. 16(b) of the Exchange Act extended beyond the 6-month period beginning with the dates his ISOs were granted, we need not address petitioner's challenge to the validity of sec. 1.83-3(j)(1), Income Tax Regs.

any increase in the income of the taxpayer or deduction from income of his employer corporation shall be recognized in the taxable year in which such disposition occurs.

The fair market value of the MGC shares petitioner was entitled to purchase under his ISOs, measured as of the dates petitioner's ISOs were granted and which were first exercisable in 1999 and 2000, exceeded $100,000. The parties also agree that during 2000 and 2001, petitioner engaged in disqualifying dispositions of MGC shares that he acquired upon exercising his ISOs.

Respondent determined that the value of the MGC shares petitioner could acquire pursuant to his ISOs exceeded the $100,000 limit imposed under section 422(d) by $316,298 and $95,648 for 1999 and 2000, respectively.[12] Petitioners contend, without citation to any authority or any meaningful discussion, that respondent erroneously applied section 422(d). As we understand petitioners' position, they assert the $100,000 limitation is only applied to shares that are not subject to a

_____

[12] Respondent determined the following shares were not eligible to be treated as having been transferred to petitioner pursuant to ISOs: (1) 10,499 of the 22,500 shares that were the subject of option grant No. 2 dated Sept. 4, 1998; (2) all of the 45,000 shares that were the subject of option grant No. 3 dated Sept. 4, 1998; (3) 6,057 of the 15,000 shares that were the subject of option grant No. 4 dated Mar. 1, 1999; and (4) all of the 22,500 shares that were the subject of option grant No. 5 dated Mar. 1, 1999.

subsequent disqualifying disposition during the same taxable year in which the shares were acquired.  We disagree.

Section 422(b), summarized supra note 7, sets forth the definition of the term "incentive stock option".  Section 422(b) does not impose a holding period requirement on shares of stock acquired pursuant to the exercise of an ISO, nor does it cross-reference section 422(a)(1) or otherwise exclude shares which are later subject to disqualifying dispositions.  Equally important, although section 422(a) provides the general rule that section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to an exercise of an ISO if, among other requirements, certain holding periods are satisfied under section 422(a)(1), section 422(a) does not state that a violation of the holding period requirement will cause the option to fail to qualify as an ISO.  Along the same lines, although section 421(b) describes the tax effects if a taxpayer receives shares of stock pursuant to the exercise of an option which would meet the requirements of section 422(a), except for a failure to meet any of the holding period requirements of section 422(a)(1), section 421(b) does not state that the option is not to be considered an ISO.  In contrast, section 422(d) unambiguously states that options exceeding the $100,000 limitation "shall be treated as options which are not incentive stock options."

In the absence of any language in the controlling statutory provisions suggesting a disqualifying disposition of stock will cause the related option to be treated as something other than an ISO, we reject petitioners' argument on this point. We sustain respondent's interpretation and application of the $100,000 limit imposed under section 422(d) in this case.

V. Whether Petitioners May Reduce Their AMTI in 2000 by AMT Capital Losses Realized in 2001

Capital Losses Under Regular Tax and Alternative Minimum Tax

Sales of securities generally are subject to the capital gain and loss provisions. Section 165(f) provides that capital losses are permitted only to the extent allowed in sections 1211 and 1212.

Under section 1212(b), a noncorporate taxpayer is required to offset capital losses against capital gains for a particular taxable year. If aggregate capital losses exceed aggregate capital gains for a taxable year, up to $3,000 of the excess may be deducted against ordinary income.[13] Sec. 1212(b). A noncorporate taxpayer may carry forward unrecognized capital losses to subsequent taxable years, but it does not allow such

---

[13] For married individuals filing separately, $3,000 is reduced to $1,500. Sec. 1211(b)(1). If the excess of capital losses over capital gains is less than $3,000 (or $1,500), then only that excess may be deducted. Sec. 1211(b)(2).

unrecognized capital losses to be carried back to prior taxable years. Sec. 1212(b). The Internal Revenue Code does not explicitly address the treatment of capital losses for AMT purposes. See secs. 55-59 (and accompanying regulations).

Petitioners are not securities dealers, and they held their MGC shares strictly as investors. There is no dispute the MGC shares in question are capital assets under section 1221. The record also shows petitioner sold MGC shares in 2001 and that he realized capital losses as a result.[14] However, the capital loss limitations of sections 1211(b) and 1212(b) restricted petitioners' ability to deduct these regular capital losses.[15]

Petitioners also realized AMT capital losses in 2001 taking into account petitioner's adjusted AMT basis in his MGC shares. Petitioners contend that they may carry back these AMT capital losses to reduce their AMTI in 2000. Petitioners argue the capital loss limitations of sections 1211 and 1212 do not apply to bar the carryback of AMT capital losses for purposes of calculating AMTI. We disagree.

---

[14] To avoid confusion between petitioner's capital losses, we shall refer to his capital losses for regular tax purposes as his "regular capital losses", and we shall refer to his capital loss for AMT purposes as his "AMT capital loss".

[15] The effect of the capital loss limitations of secs. 1211(b) and 1212(b) for regular tax purposes is not in issue and thus, is not discussed in detail.

In <u>Merlo v. Commissioner</u>, 126 T.C. 205, 211-212 (2006), on appeal to the U.S. Court of Appeals for the Fifth Circuit, the Court recently rejected the argument that the capital loss limitations of sections 1211 and 1212 do not apply for purposes of calculating a taxpayer's AMTI.  In so holding, we cited section 1.55-1(a), Income Tax Regs., which states in pertinent part that, except as otherwise provided:  "[A]ll Internal Revenue Code provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer."  In the absence of any statute, regulation, or other published guidance which purports to change the treatment of capital losses for AMT purposes, we held the capital loss limitations of sections 1211 and 1212 apply in calculating a taxpayer's AMTI.  <u>Id.</u> at 212.

Like the taxpayer in <u>Merlo v. Commissioner</u>, <u>supra</u>, petitioners argue the instructions to lines 9 and 10 of Form 6251 for 2000 do not mention section 1211, and, therefore, section 1211 does not apply for purposes of calculating petitioners' AMTI.  Petitioners' reliance on these instructions is misplaced. It is settled law that taxpayers cannot rely on Internal Revenue Service instructions to justify a reporting position otherwise inconsistent with controlling statutory provisions.  <u>Johnson v. Commissioner</u>, 620 F.2d 153, 155 (7th Cir. 1980), affg. T.C. Memo.

978-426; <u>Graham v. Commissioner</u>, T.C. Memo. 1995-114; <u>Jones v. Commissioner</u>, T.C. Memo. 1993-358.

Consistent with <u>Merlo v. Commissioner</u>, <u>supra</u>, we conclude petitioners may not carry back their AMT capital losses to reduce their AMTI in 2000.  See <u>Spitz v. Commissioner</u>, T.C. Memo. 2006-168.

VI.  <u>Whether Petitioners May Carry Back Net Operating Losses and Alternative Tax Net Operating Losses To Reduce Their AMTI for 2000</u>

In a further attempt to carry back their AMT capital losses, petitioners assert their AMT capital losses entitle them to an ATNOL deduction under section 56.  This, too, is an argument the Court rejected in <u>Merlo v. Commissioner</u>, <u>supra</u>.

A taxpayer normally may carry back a net operating loss (NOL) to the 2 taxable years preceding the loss, then forward to each of the 20 taxable years following the loss.[16]  Sec. 172(b)(1)(A).  Section 172(c) defines an NOL as "the excess of the deductions allowed by this chapter over the gross income", as modified under section 172(d).  In the case of a noncorporate taxpayer, the amount deductible on account of capital losses shall not exceed the amount includable on account of capital gains.  Sec. 172(d)(2)(A); sec. 1.172-3(a)(2), Income Tax Regs.

---

[16]  In the case of NOLs incurred in 2001 or 2002, sec. 172(b)(1)(H) creates a 5-year carryback.  Petitioners argue they are entitled to relief from the 5-year carryback.  However, because we conclude <u>infra</u> that petitioners are not entitled to an ATNOL, petitioners' argument is moot.

Consequently, the effect of section 172(d)(2)(A) is that net capital losses are excluded from the NOL computation.  See, e.g., Parekh v. Commissioner, T.C. Memo. 1998-151.  In Merlo v. Commissioner, supra, we stated in pertinent part:

> For AMT purposes, section 56(a)(4) provides that an ATNOL deduction shall be allowed in lieu of an NOL deduction under section 172.  An ATNOL deduction is defined as the NOL deduction allowable under section 172 and is computed by taking into consideration all the adjustments to taxable income under sections 56 and 58 and all the preference items under section 57 (but only to the extent that the preference items increased the NOL for the year for regular tax purposes).  Sec. 56(d)(1).
>
> Petitioner's net regular capital loss is excluded from computing his NOL deduction.  See sec. 172(c), (d)(2)(A); sec. 1.172-3(a)(2), Income Tax Regs.  For AMT purposes, petitioner's ATNOL is the same as his NOL, taking into consideration all the adjustments to his taxable income under sections 56, 57, and 58.  See sec. 56(a)(4), (d)(1).  No adjustments under those sections modify the exclusion of net capital losses from the NOL computation under section 172(d)(2)(A). Therefore, petitioner's AMT capital loss is excluded for purposes of calculating his ATNOL deduction.  As a result, petitioner's AMT capital loss realized in 2001 does not create an ATNOL that can be carried back to 2000 under sections 56 and 172(b).

Merlo v. Commissioner, supra at 212-213 (fn. ref. omitted).

Consistent with Merlo v. Commissioner, supra, we hold petitioners may not claim an ATNOL carryback to reduce their AMTI for 2000.  See Spitz v. Commissioner, supra.

VII.  Whether Petitioners Are Liable for a Substantial Understatement Penalty Under Section 6662(b)(2)

Respondent determined petitioners are liable for a

substantial understatement penalty under section 6662(b)(2).[17]
Petitioners assert (1) respondent's determination is invalid
because respondent did not consider "standardized exception
criteria" before imposing the penalty, and (2) the penalty is
inapplicable because petitioners acted in good faith and
reasonably relied upon tax professionals to prepare their tax
return for 2000.

While the Commissioner bears the initial burden of
production as to the accuracy-related penalty and must come
forward with sufficient evidence showing it is appropriate to
impose the penalty, the taxpayer bears the burden of proof as to
any exception to the accuracy-related penalty.  See sec. 7491(c);
Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447
(2001).  One such exception to the accuracy-related penalty
applies to any portion of an underpayment if the taxpayer can
prove there was reasonable cause for the taxpayer's position and
the taxpayer acted in good faith with respect to that portion.
Sec. 6664(c)(1); sec. 1.6664-4(b), Income Tax Regs.  The
determination of whether a taxpayer acted with reasonable cause

---

[17] There is a substantial understatement of tax if the
amount of the understatement exceeds the greater of either 10
percent of the tax required to be shown on the return, or $5,000.
Sec. 6662(a), (b)(1) and (2), (d)(1)(A); sec. 1.6662-4(a) and
(b)(1), Income Tax Regs.  This threshold is satisfied in the
instant case.

and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional. Sec. 1.6664-4(b)(1), Income Tax Regs. When a taxpayer selects a competent tax adviser and supplies him or her with all relevant information, it is consistent with ordinary business care and prudence to rely upon the adviser's professional judgment as to the taxpayer's tax obligations. United States v. Boyle, 469 U.S. 241, 250-251 (1985). Moreover, a taxpayer who seeks the advice of an adviser does not have to challenge the adviser's conclusions, seek a second opinion, or try to check the advice by reviewing the tax code himself or herself. Id.

Petitioners received professional assistance in preparing their 2000 tax return. The return was prepared and signed by a representative of Deloitte & Touche, and we are satisfied from a review of the return petitioners supplied the return preparer with all relevant information. We likewise conclude petitioners relied on their return preparer to accurately and properly prepare their return for 2000. We find nothing in the record to indicate it was unreasonable for petitioners to accept the advice of their return preparer. Our holding sustaining respondent's determinations on the substantive issues in dispute does not, in and of itself, require holding for respondent on the penalty.

See <u>Hitchins v. Commissioner</u>, 103 T.C. 711, 719-720 (1994) ("Indeed, we have specifically refused to impose * * * [a penalty] where it appeared that the issue was one not previously considered by the Court and the statutory language was not entirely clear."). Considering that the complex issues underlying the deficiency in this case had yet to be litigated at the time petitioners filed their return for 2000, we are persuaded petitioners had reasonable cause and acted in good faith in reporting their stock option transactions. See, e.g., <u>Williams v. Commissioner</u>, 123 T.C. 144 (2004) (declining to impose a penalty involving an issue of first impression and the interrelationship between complex tax and bankruptcy laws). Consequently, we hold petitioners are not liable for an accuracy-related penalty under section 6662(b)(2) for 2000.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>pursuant to Rule 155.</u>